In re **FOUR SEASONS SECURITIES LAWS LITIGATION—Opinion No. 3.**
**M.D.L. No. 55.**

United States District Court,
W. D. Oklahoma.

May 18, 1973.

See also, D.C., 59 F.R.D. 667.

---

### Allowance of Fees to Counsel for Plaintiffs

THOMSEN, District Judge.[*]

Applications for allowance of counsel fees and expenses out of the "Class Settlement Fund" of $7,000,000, see Opinion No. 2 herein, 58 F.R.D. 19, at 32, 33, have been filed by: (1) J. Vernon Patrick, Jr., and Marvin Cherner, jointly, as attorneys for Sher and for Ginsberg, each of whom was the plaintiff in one of the actions designated as a class action by this court in the order of September 21, 1972, 58 F.R.D. at 32 et seq.; (2) Ira J. Sands, the attorney for Fink, the plaintiff in two such actions, and the attorney or one of the attorneys in several actions not so designated;[1] (3) Harry A. Young, Jr., attorney for Fetman et al., plaintiffs in one such action; and (4) Stull and Stull, attorneys for Nussbacher, plaintiff in an action which has not been designated as a class action. A hearing on these applications was held immediately after the hearing on approval of the settlement; there have been two subsequent hearings on fees and expenses, and additional affidavits and memoranda have been filed.[2]

Many of the facts relevant to the applications are set out in Opinion No. 2, 58 F.R.D. 19. Those facts will not be repeated.

After the events which occurred on or before May 12, 1970, set out under the heading "Historical Statement", 58 F.R.D. at 21 et seq.,[3] actions were filed in several districts and several state courts against various defendants. The first action was filed on May 21, 1970, in the Southern District of New York, by Stull and Stull, attorneys for Nussbacher, a stockholder of Four Seasons Nursing Centers of America (America).[4]

Also in May 1970, Matthew D. Margoles, a lawyer and brother-in-law of James A. Geller, brought to the firm known as Sands, Geller and Webb another lawyer, Lowell S. Fink, who was a stockholder in two of the Four Seasons companies. A complaint based upon Fink's loss as a stockholder of America was prepared by Sands, Geller and Webb and filed in the Southern District on June 1.[5]

---

[*] Of the District of Maryland, sitting by designation.

1. In the affidavit filed by Sands in support of his application and at the November 1972 hearing thereon, Sands stated that his fee application included work done by Robert B. Levin, who has been associated with Sands in these cases, and by other attorneys. Thereafter, Levin and James A. Geller, a former partner of Sands, have each asserted a claim to a share of any fee allowed Sands. See also n. 12 and n. 16, below.

2. In making the awards herein, the court has considered not only the affidavits, exhibits and memoranda presented in connection with the fee applications, but also the entire record in this multidistrict proceeding (M.D.L. 55), including all pleadings, evidence, statements made by counsel at the hearings herein and at the hearing before the Judicial Panel on Multidistrict Litigation, which resulted in the first transfer order. In Re Four Seasons Securities Laws Litigation, 328 F.Supp. 221 (Jud.Pan.Mult.Lit.1971).

3. See also the paragraph immediately preceding the "Historical Statement".

4. It was brought both as a derivative action under Rule 23.1 on behalf of America and as a class action under Rule 23. The complaint alleged violations of § 10 (b) of the 1934 Act (15 U.S.C. § 78j) and Rule 10b–5 of the SEC, particularly a plan or scheme embarked upon by the management defendants, aided and abetted by the Walston defendants.

5. That suit was also brought as a class action and as a derivative action on behalf of America. The complaint alleged

On June 26, 1970, America filed its petition for reorganization in the Western District of Oklahoma. On the same day Sands, Geller and Webb filed in the Southern District of New York an action for Fink as a stockholder of Four Seasons Equity Corporation (Equity); also in June three other attorneys, including Robert B. Levin, filed complaints in the Southern District similar to the Fink complaints or the Nussbacher complaint.

The Ginsberg case was filed in the Northern District of Ohio on July 10, 1970, the Sher case in the Western District of Oklahoma on July 23, and the Fetman case in the Northern District of Illinois on July 31. Two other cases were filed in the summer of 1970.

Ten of the cases were promptly brought to the attention of the Judicial Panel on Multidistrict Litigation, which held a hearing on September 24, 1970, at which Patrick and counsel for defendants urged transfer to Oklahoma, while Sands and those associated with him argued for New York.[6] After full consideration, the Panel transferred the cases to the Western District of Oklahoma on May 26, 1971, and assigned them to me for coordinated or consolidated pretrial proceedings. 328 F.Supp. 221 (Jud.Pan.Mult.Lit.1971). A dozen other cases filed in various districts, including the Fetman case, have been transferred by the Panel to this court under § 1407.

Meanwhile, at the instance of Sands and the attorneys acting in association with him, and over the objection of Stull, Judge Croake consolidated the six actions in the Southern District of New York on July 14, 1970, and designated Sands, Geller and Webb as lead counsel in those cases on August 7. They also sought, unsuccessfully, to have the court stay the commencement and prosecution of any other action by any other stockholders of America or Equity on behalf of themselves or on behalf of either corporation.

The firm of Sands, Geller and Webb was dissolved in December 1970. Shortly thereafter, Sands caused himself to be designated as lead counsel by a judge of the Southern District, but that designation was revoked by Judge Bryan, at the instance of Stull.[7] Neither Sands nor anyone else has ever been designated as lead counsel in the M.D.L. 55 proceeding.

Because of the appointment of a Trustee in the Chapter X proceedings, the derivative aspects of the actions brought by the stockholders have not been pressed.[8] The claims of the Four Seasons corporations against various defendants were asserted in a separate action in this court by the Trustee and were settled as part of the joint settlement discussed in Opinion No. 2.[9]

The proceedings in this court in the M.D.L. 55 actions are set out in Opinion No. 2 under the heading "M.D.L. 55", 58 F.R.D. at 28 et seq., and should be read at this point as part of this opinion. Only a few additional facts will be noted.

---

violations of §§ 11, 12 and 17(a) of the 1933 Act, § 10(b) of the 1934 Act, Rules and Regulations under those Acts, and the common law. Fink was referred to as "Chairman of the Protective Committee of Stockholders of Four Seasons Nursing Centers of America".

6. Stull also supported the transfer to Oklahoma.

7. Judge Bryan also directed that any plaintiff who wished Sands individually to replace the firm as his attorney or as trial counsel should so indicate on the record. Several plaintiffs did so in July 1971 after the cases had been transferred to this court under § 1407.

8. 3B Moore's Federal Practice, ¶ 23.1.16 [1]; Meyer v. Fleming, 327 U.S. 161, 66 S.Ct. 382, 90 L.Ed. 595 (1946).

9. See the material under the headings "The Chapter X Proceedings", 58 F.R.D. at 26 et seq., "The Settlement", at 32 et seq., and "Subsequent Proceedings", at 36.

Patrick-Cherner wished to proceed to trial promptly on the theory of a single conspiracy ab initio with a single class and possible sub-classes. They took the position that the single conspiracy theory was a sufficient basis for recovery, and that it was the only theory which would permit a readily manageable proceeding.[10] Sands proposed a group of three classes. Young suggested two classes with possible sub-classes. Defendants argued for various classes and sub-classes. The apparent inability or unwillingness of Sands to focus his oral statements on pertinent points made it difficult for the court to understand exactly what his position was from time to time on this and other questions, or to trust his judgment. Patrick-Cherner found it impossible to cooperate adequately with Sands in the discovery process; this resulted in considerable duplication of effort. Young cooperated with other counsel as far as possible.

The determination of the proper classes of plaintiffs was complicated by Sands' efforts to file for Fink a third amended verified complaint, adding four large broker-dealers on a market manipulation theory, and his subsequent dismissal of that proposed complaint as against them without prejudice. His carelessly pleaded efforts to create several classes of defendants in the original and amended Fink complaints should also be noted. See 58 F.R.D. at 30.

After a hearing in May 1972, the parties engaged in serious settlement negotiations, while the effort to establish proper classes continued. See 58 F.R.D. at 30, 31.

In July the court designated Young as liaison counsel between plaintiffs' attorneys and the court during the settlement negotiations. On September 21, Patrick-Cherner, Sands-Levin and Young, together with counsel for the defendants, presented to the court a settlement agreement, embodied in a proposed order, notice and accompanying documents. The order, conditionally approving the proposed settlement for submission to the members of the classes established by the order for the purpose of effectuating the proposed settlement, and the notice attached to the order as an exhibit, were signed by the court on September 21, after a hearing.

The settlement was approved at a hearing in Oklahoma City on November 16–17, 1972. The proceedings at that hearing and relevant subsequent proceedings are set out in 58 F.R.D. at 35, 36.

The amount of money received for the benefit of the classes in M.D.L. 55 is $7,000,000; other benefits which they receive under the joint settlement have a value of about $1,000,000 to members of the classes. See discussion in Opinion No. 2 under the heading "The Amount of the Settlement". 58 F.R.D. at 36 et seq.[11]

The allowances requested are as follows:

Patrick-Cherner, $750,000, plus expenses of $28,361.61.

Sands, for himself, Levin and unspecified other attorneys,[12] $1,000,000, plus expenses of $31,022.

---

10. See 58 F.R.D. at 37 et seq., under the headings, "Likelihood of Plaintiffs' Success", "Classes and Subclasses", "Likely Duration of Litigation", and "Manageability".

11. As noted above, the settlement included the claims asserted by the Trustee appointed in the Chapter X proceeding. The settlement of the Trustee's claims for $1,-500,000 has been approved in that proceeding.

12. In the affidavit filed by Sands "in support of his application for the allowance and disbursement", and at the November 1972 hearing, Sands stated that from his fee must come a sub-fee for work done by other counsel for those plaintiffs whom Sands represents in the M.D.L. 55 proceeding, and indicated that his application included not only the work done by him and others in his office, but also an unspecified amount of work done by such other counsel, and some time

Young, $650,000, plus expenses of $16,134.

Stull, $110,000, plus expenses of $1,625.

*Applicable Legal Principles.* The legal principles controlling the allowance of fees in class actions are discussed and many leading cases cited in Wright & Miller, Federal Practice and Procedure: Civil, § 1803, and 3B Moore's Federal Practice ¶ 23.91. One of the most frequently quoted cases is Angoff v. Goldfine, 270 F.2d 185 (1 Cir. 1959), a stockholder's derivative suit, where the court listed the factors to be considered in awarding fees in such cases.[13]

Those factors are similar to those listed in DR 2–106 in the current ABA Code of Professional Responsibility.[14] The Manual for Complex Litigation (January 24, 1973, Revision), § 1.47, concludes that "in addition to the standards for charging and collecting fees for legal services set forth in the Code of Professional Responsibility of the American Bar Association effective in 1970, standards applicable to the charging, collecting, and allowance by a court of fees

spent by him and his office on other claims with respect to which either no suit was filed or a suit was filed which was not designated as a class action by the court. No justification has been shown for charging such items against the classes in M.D.L. 55.

At the November 1972 hearing Sands and Levin indicated that they had agreed or would agree upon Levin's share of any fee allowed Sands. After indecisive statements at the subsequent hearings, they have now asked the court to decide how the fee to be allowed Sands should be divided between them, and each has submitted two additional affidavits and many exhibits. The court has decided to make a separate allowance to Levin, taking into account that the entire overhead of the office was borne by Sands.

James A. Geller, a former partner of Sands in a firm known as Sands, Geller and Webb, has filed a petition asking that part of the fee claimed by Sands should be awarded to the firm for work done during 1970. Sands has replied to Levin's and Geller's claims.

13. The Court said: " * * * These factors are: the amount recovered for the corporation; the time fairly required to be spent on the case; the skill required and employed on the case with reference to the intricacy, novelty and complexity of issue; the difficulty encountered in unearthing the facts and the skill and resourcefulness of opposing counsel; the prevailing rate of compensation for those with the skill, experience and standing of the attorneys, accountants or others involved; the contingent nature of the fees, with the accompanying risk of wasting hours of work, overhead and expenses

(for it is clearly established that compensation is awarded only in the event of success) ; and the benefits accruing to the public from suits such as this. * * * " Angoff v. Goldfine, 270 F.2d at 189.

14. *"DR 2–106* Fees for Legal Services.

"(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

"(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

"(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

"(3) The fee customarily charged in the locality for similar legal services.

"(4) The amount involved and the results obtained.

"(5) The time limitations imposed by the client or by the circumstances.

"(6) The nature and length of the professional relationship with the client.

"(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

"(8) Whether the fee is fixed or contingent.

"(C) A lawyer shall not enter into an arrangement for, charge, or collect a contingent fee for representing a defendant in a criminal case."

for services rendered to a class formed under amended Rule 23 should be developed". The Manual suggests in § 1.47 some of the standards which should be applied. It states, inter alia:

"These additional standards should include a recognition of the following: (1) that in seeking and accepting employment as counsel for a judicially determined class an element of public service is involved; (2) the representation of the class by counsel is not a result of private enterprise but results from provision of an opportunity to represent the class by a judicial determination; and (3) the policy of the law in class actions, including antitrust actions, is to provide a motive to private counsel to represent consumers and to enforce the laws.

"Once adequate compensation sufficient to provide the motive for representation of classes is provided, no further incentive is required. In this connection, while any fee allowed in the case of a settlement or recovery through litigation may constitute a percentage of the total amount recovered, the reasonableness of the fee arrived at should not rest primarily on the selection of a percentage of the total recovery. Although the results obtained in representing the class should be given consideration as provided in the Code of Professional Responsibility, there should also be an emphasis upon the time and labor required and the effect of the allowance on the public interest and the reputation of the courts. In no event should representation of a judicially determined class be allowed on the same basis as in a contingent fee contract between competent contracting counsel and client."

The last paragraph in § 1803 of Wright & Miller, supra, also deserves quotation.[15]

All of the factors suggested by the authorities cited have been considered in making the allowances herein

*Complexity, Novelty and Difficulty of the Issues.* The issues in this proceeding were complex and difficult and some of them were novel. Many of those issues were not reached because of the settlement, but counsel on both sides had given thought to them. In their consideration of the issues, counsel for plaintiffs were greatly aided by the investigation and reports of the SEC and Amex. See 58 F.R.D. at 25, 26, 35.

*Skill Required and Employed.* At the time the settlement agreement was reached and approved, the case had not progressed beyond (1) document discovery, (2) discovery with respect to class issues, which was also confined to document discovery, except for the depositions of two witnesses taken before the court on two successive days, and (3) statements of position, briefs and oral argument on the class issues.

The number of documents examined was large, but obtaining the documents required relatively little ingenuity or court work. At the hearing before the Panel in September 1970, Sands said: "I do not believe that for my prima facie case I will require anything more than the reports which were filed with the American Stock Exchange and the Securities and Exchange Commission, coupled with information from those persons whom I have interviewed in

---

15. "In considering the propriety of awarding attorneys' fees and fixing the amount thereof in a particular action, the court must exercise caution lest it deplete the recovery when the class is successful or unduly encourage the institution of class suits by creating an impression of judicial generosity in these cases. The class action device must be protected against the taint that it is a source of strike suits promoted by attorneys who simply are seeking fat fees or that it fosters an unseemly race to the courthouse among lawyers who represent different members of the class and wish to acquire representative and lead counsel status." Wright & Miller, Federal Practice and Procedure: Civil, § 1803.

New York." At the same hearing Patrick said: "I don't think any of us, regrettably, counsel for plaintiffs, can take the credit for having unearthed something here. The SEC did it."

Patrick-Cherner argued skillfully before this court motions for the production of certain Arthur Andersen documents and other documents of which the right to discovery was disputed. Aided by other counsel for plaintiffs, they carried the laboring oar in obtaining certain transcripts, exhibits and documents from the SEC. See Opinion No. 1 herein, 54 F.R.D. 527 (1972).

*Opposing Counsel.* The attorneys for the defendants were able, energetic and forceful. They cooperated in making available the relevant documents, objecting only where there was a reasonable chance of success.

*Experience, Skill and Standing of Attorneys.* Patrick, Cherner, Sands, Young and Stull had all had previous experience in securities cases.

Patrick, Cherner and Young are able lawyers. The inapt and otherwise inept arguments and statements made by Sands at various times throughout the proceeding cast serious doubt on his legal ability. The affidavits and exhibits filed by Sands in support of his application for a fee and expenses and in opposition to the claims of others show an utter lack of candor and lack of judgment. Levin appeared to be careful and helpful. Stull made little effort during the M.D.L. proceedings to display whatever skill he may have.

The standing of Patrick, Cherner, Young and Stull has not been challenged by anyone. The standing of Sands is discussed in note 16 in the margin. This court has given Sands full opportunity to respond to all material presented adverse to him; he has done so, at very great length.

*Time Spent on the Case.* Patrick-Cherner were active not only in M.D.L. 55, but also in the related Chapter X proceeding and filed a petition for an allowance of fees therein, which will be discussed under the heading "The Chapter X Proceeding", below. They spent a total of 1,112 hours on investigation and analysis of facts important with respect to both M.D.L. 55 and the Chapter X proceeding.[17] They spent 1,409 hours on research, briefing and analysis in connection with M.D.L. 55 problems, and

16. Stull attacked the standing of Sands in a paper filed before the first pretrial conference in M.D.L. 55, citing, inter alia, the action by Judge Bryan referred to in n. 7 above. He called the court's attention to the following opinions in which Sands' actions or ability had been criticized: Korn v. Franchard Corp., 50 F.R.D. 57 (S.D.N.Y., Mansfield, J., 1970), reversed and remanded for specific reasons, 456 F.2d 1206 (2 Cir. 1972), see particularly p. 1208 and n. 4; Taub v. Glickman, Federal Securities Laws Reports ¶ 92,874, 14 Fed.Rules Service 2d 847 (S.D.N.Y., Tenney, J., 1970). In November 1972 Sands attacked portions of the Patrick-Cherner fee application, claiming that they had not cooperated with him and were claiming too much credit for various accomplishments. They responded vigorously, filing an affidavit and calling the court's attention, inter alia, to the opinions referred to in this note.

In an action which Sands filed against Geller and Webb after the dissolution of the partnership known as Sands, Geller and Webb, Sands contended that Webb was not a partner, but was employed on a salaried basis. This fact was not disputed. In ruling on a question of jurisdiction, Judge Pollack criticized Sands and Geller for representing that Webb was a member of the firm. Sands v. Geller, 321 F.Supp. 558, at 560, 561, including n. 1 thereto. In the motion filed in the Southern District of New York which resulted in the order appointing Sands, Geller and Webb lead counsel in the New York cases, the experience of the "three" members of the firm was set out. Sands filed a copy of that motion as an exhibit to one of his affidavits in support of his fee application.

17. For reasons discussed below, this court finds that the 1,112 hours should be considered in allowing a fee to Patrick-Cherner herein, with appropriate recognition of the fact that they have received an allowance in the Chapter X proceeding which also took those hours into account.

304 hours in connection with the settlement of the M.D.L. claims.[18]

Young spent 1,320 hours himself, and his partners and associates in his office spent 691 hours, a total of 2,011 hours on the M.D.L. 55 litigation.

Sands kept no time records. Time records are highly desirable in such a proceeding as this,[19] although they are not required by any statute or rule. Sands estimated that members of his paraprofessional staff spent more than 1,600 man hours on work pertaining to this litigation,[20] and that 106 attorney hours were spent by him and Levin in connection with the settlement negotiations, including attendance in Baltimore when the September 21, 1972, order was signed. Sands stated that he was participating in about 20 securities cases during the period June 1970 to September 1972, in some of which he was taking a leading position. His reiterated emphasis on the importance of some of these cases indicates how widely he spread his time. His recent memoranda, attempting to show that most of his time was devoted to M.D.L. 55, is not persuasive. The conflicting statements which Sands has made from time to time with respect to other cases he has been handling weakens the credibility of his affidavits and statements on this and other points. There were other reasons besides M.D.L. 55 which caused him to refer the handling of certain cases to other lawyers.[21] Sands' application for a fee includes not only work done by his former partner Geller and lawyers associated with his former firm or with him, including Levin, but also work done by an accountant and other paraprofessionals employed by the firm, and work done by unspecified other lawyers not in his office. It has not been shown that the work done by such other lawyers was of any benefit to the classes out of whose recovery these fees must be allowed.

Although Patrick-Cherner, Young and Sands-Levin devoted a substantial amount of time to this case over a period of more than two years, they were not seriously prevented from handling and undertaking employment in other cases.

Patrick-Cherner, Young and Sands-Levin spent some hours, perhaps 100 hours each, in connection with the approval of the settlement, after they had filed their original applications.

Stull claims that he and his partners and associates, including an accountant-attorney, spent 549 hours of attorneys' time and 53 hours of accountants' time, a total of 602 hours on the case. The court finds that they spent about 30 hours in preparing the Nussbacher complaint, including research, etc., and spent some hours opposing the appointment of Sands as lead counsel in New York. Stull filed a position statement with the Panel and a request to this court that he and Patrick be appointed lead counsel. Stull attended the May 1972 conference and states that he urged plaintiffs' counsel to cease squabbling among themselves. He did not participate in negotiating the settlement, but attended a meeting of counsel in New York early in November 1972 to prepare for the November 16 hearing on the settlement.

---

18. Patrick-Cherner also spent 434 hours in research, briefing and argument in connection with Chapter X problems, and 138 hours in settlement negotiations in the Chapter X proceedings, in addition to the 1,112 hours, referred to above.

19. But see In re Borgenicht, 470 F.2d 283 (2 Cir. 1972), a decision of the Circuit in which Sands has his office.

20. The time spent by paraprofessionals in Sands' office is part of his office overhead. The fact that Sands paid all the office expenses has been considered in the division between Sands and Levin.

21. The material submitted by Sands himself and by Levin, Patrick-Cherner and Stull shows that Sands often refers his important cases to abler counsel for preparation and trial.

Most of the time claimed was spent in reading papers sent him by other attorneys. His contribution to the benefits conferred upon the class was small, but not negligible.

*The Amount Recovered.* As we have seen, the amount of cash recovered for the benefit of the classes in M.D.L. 55 is $7,000,000; other benefits which they receive under the joint settlement have a value to members of the classes of about $1,000,000. The latter figure includes $500,000, one-third of the total amount paid to the Trustee in the Chapter X proceeding in settlement of the claims which he had asserted. The creditors entitled to that $500,000 are substantially the same persons who are members of the classes herein. Counsel for the Trustee has been allowed a fee in the Chapter X proceeding out of that $500,000, and so have Patrick-Cherner.[22]

As this court noted under the heading "The Amount of the Settlement", 58 F. R.D. at 36, 37, the total amount paid is historically large; but it is only about 7% of the claims which have been filed herein.[23] It was approved after considering the factors discussed in 58 F.R.D. at 32 et seq., including the footnotes. Counsel had already spent a substantial number of hours and had advanced substantial sums of money for expenses over a period of more than two years. They were willing to continue the litigation, but none of them was eager to devote the necessary time and effort to carry the litigation to a conclusion. Although judgments for the full amount of the claims, over $110,000,000, probably would not have been collectible, a large percentage thereof probably would have been, but only after prolonged and uncertain litigation.

In this case, therefore, we do not have a recovery of all or a large portion of the claims after a trial, or even of a large percentage of the claims after a settlement. We have a modest settlement after a relatively short period of time compared to the period which would necessarily have had to be spent in an effort to secure a larger amount. Almost all members of the classes, as well as the lawyers, agreed that it was better to take a quick settlement for a modest amount rather than pursue what promised to be long and difficult litigation.[24]

*The Chapter X Proceeding.* Both Patrick-Cherner and Sands seek allowance in this M.D.L. 55 proceeding for time spent in establishing the rights of the class which became known as the "Class G Creditors" in the Chapter X proceeding to receive one-third of the stock in the reorganized corporation (Anta) as part of the plan of reorganization approved in the Chapter X proceeding. The membership of that class is generally the same as the membership of the classes established herein. They have also asked this court to consider the $500,000 interest of the Class G Creditors in the $1,500,000 received by the Trustee as part of the joint settlement of the M.D.L. cases and the claims asserted by the Trustee.

Patrick-Cherner filed in the Chapter X proceeding an application for an allowance of fees and expenses in the total amount of $200,000 for services they rendered to the Class G Creditors, to be paid out of funds allocated to the Class G Creditors in that proceeding. Judge Bohanon of this court, who has handled the Chapter X proceeding, allowed Patrick-Cherner a total fee of $40,000, $20,000 of which was allowed for their services in connection with the approval

22. See discussion under the heading "The Chapter X Proceeding", below.

23. Claims totaling about $115,000,000 have been filed. Objections have been filed to very few of them.

24. Only seven class members, having about one-third of 1% of the amount of the claims, objected to the settlement. Less than 1% opted out.

of the plan of reorganization, and $20,000 for their services in connection with the Trustee's settlement of class claims, which resulted in Class G Creditors receiving one-third of the stock of Anta.[25] Patrick-Cherner have filed a petition for leave to appeal from that order.

Sands filed no applications for a fee in the Chapter X proceeding. He represented, in association with various lawyers, over 30 persons who had claims in the Chapter X proceeding as well as in this proceeding.[26] He has received or will receive a percentage of the Anta stock which those persons have received or will receive as a result of the Chapter X settlement. Sands will share that fee with an Oklahoma lawyer who was associated with him in that proceeding, and in some instances with other lawyers.

Under the circumstances of this case, the principle stated in Sprague v. Ticonic Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), cited by Patrick-Cherner and Sands, does not justify an award to counsel for any of the plaintiffs in M.D.L. 55 based upon results accomplished in the Chapter X proceedings.[27]

*Prevailing Rates.* It is impossible to fix an hourly rate applicable to the varying abilities and contributions of applicants. Moreover, an hourly rate is not the proper basis for the awards in this case, because something would have to be added because of the contingent nature of the fees, and the benefits accru-

ing to the public from suits such as this. The court should also consider: (a) the duplication of effort caused by the inability of Patrick-Cherner and Sands to cooperate, and (b) the efforts of the attorneys to have themselves designated as lead counsel. The court is allowing fees herein only for services which benefited the classes.

*Contingent Nature of the Fees.* Here the attorneys, as well as the class, were willing to accept a modest settlement rather than face a long, hard fight, with uncertain results. Some offer of settlement in such a proceeding as this is almost certain. The amount of the settlement of the M.D.L. 55 class actions, considered along with the $1,500,000 paid to the Chapter X Trustee, was probably two or three times what experienced counsel could reasonably have expected the many defendants would almost certainly have offered merely to avoid the trials which would have been necessary to dispose of all aspects of these actions, with a minimal recognition of possible liability. The settlement was less than 8% of the claims, and much less than the amount which could have been collected after a victory, even a partial victory. The court does not question the fairness or the wisdom of the settlement from the plaintiffs' point of view;[28] but the percentage figures which have been applied in fixing fees in other circumstances would not be appropriate here, and the figures suggested by counsel in their applications are much too high.

---

25. Judge Bohanon found that much of the time claimed by Patrick-Cherner in that case was spent by them in developing their class action suit.

26. He sought unsuccessfully to have their claims allowed on the same basis as the Class C claimants therein, and took an appeal from the order establishing the relative rights of the two groups. That appeal was dismissed as part of the overall settlement. For some reason or reasons, which need not be gone into in this proceeding, some of those persons

failed to file timely claims in the Chapter X proceeding; but their ultimate rights therein are not yet clear.

27. As stated in n. 17, supra, this court has considered the 1,112 hours spent by Patrick-Cherner in work important with respect to both M.D.L. 55 and the Chapter X proceeding, with appropriate recognition of the allowance made to them in the Chapter X proceeding.

28. See "Reasons for Approval and Confirmation of Settlement" in Opinion No. 2, 58 F.R.D. at 36.

*Expenses.* Patrick-Cherner claim expenses in the sum of $28,361, Sands of $31,022, Young of $16,134, and Stull of $1,625. No client has reimbursed any of them for any part of those advances, and it is by no means clear that if the cases had been tried and lost the lawyers would have collected all their expenses from their clients.[29]

*Allowance of Fees and Expenses.* After considering all of the evidence, affidavits, exhibits, memoranda and arguments, and giving due weight to the factors discussed above and others referred to in the authorities cited by the applicants, the court concludes that the proper allowances to the several applicants for services rendered to the classes and for expenses chargeable to the classes are as follows:[30]

To J. Vernon Patrick, Jr., and Marvin Cherner, jointly, $360,000 for their services and the services of the partners and associates of Patrick in the firm of Berkowitz, Lefkovits & Patrick, plus $28,361 expenses.

To Harry A. Young, Jr., $240,000 for his services and the services of his partners and associates in the firm of Neistein, Richman, Hauslinger & Young, Ltd., plus $16,134 expenses.

To Sands, Geller and Webb, $20,000 for services rendered by the partners, associates and employees of that firm until its dissolution in December 1970. Whether all of that sum should be paid to Sands, or whether a part should be paid to Geller, is a matter which should be decided by the Southern District of

New York in the case of Sands v. Geller, referred to above, or by some other court of appropriate jurisdiction if Sands and Geller are unable to agree.

To Ira J. Sands, for services rendered by him and his associates (except Levin) after the dissolution of the firm of Sands, Geller and Webb, $70,000, plus $31,022 for expenses covering both periods, including Levin's expenses.

To Robert B. Levin, for his services, $30,000.

To Richard J. Stull, $5,000, for services rendered by him, his partners and associates, plus $1,625 expenses.

Mr. Young, as liaison counsel for plaintiffs in connection with the settlement, is directed to prepare and circulate a proposed order.

**In re FOUR SEASONS SECURITIES LAWS LITIGATION Opinion No. 4. M.D.L. Docket No. 55.**

United States District Court,
W. D. Oklahoma.
June 7, 1973.

---

29. These facts present a troublesome problem, which is being, and undoubtedly will continue to be, considered by appropriate groups. On the one hand, to require that class representatives be responsible for all expenses of their lawyers as well as for court costs would make it practically impossible for some class actions to be maintained. On the other hand, the efforts some attorneys make to win the race to the courthouse or to be chosen as lead counsel, which result in their advancing large sums of money over a period of years without reimbursement, and in some cases without hope of reimbursement, raise questions under both Rule 23 and under DR 5-103(B) of the Code of Professional Responsibility.

30. The fees allowed to counsel for the class plaintiffs herein (Patrick, Cherner, Young, Sands and Levin) are allowed upon their statements that they will not receive any additional compensation from their clients for services in the M.D.L. 55 proceedings.