**LINDY BROS. BUILDERS, INC. OF PHILADELPHIA, et al., Plaintiffs,**

v.

**AMERICAN RADIATOR & STANDARD SANITARY CORP. et al., Defendants.**

**Civ. A. No. 41774.**

United States District Court,
E. D. Pennsylvania.
Sept. 25, 1974.

———◆———

Harold E. Kohn, David Berger, Aaron M. Fine, H. Laddie Montague, Jr. and Harold E. Kohn, P.A. and David Berger, P.A., Philadelphia, Pa., for petitioners.

William Simon, G. Joseph King and Howrey, Simon, Baker & Murchison, Washington, D. C., for claimants Humble Oil & Refining Co. and Friendswood Development Co.

ALEXANDER HARVEY, II, District Judge:

In Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973), the United States Court of Appeals for the Third Circuit remanded certain matters in this multidistrict antitrust litigation to this Court for further proceedings. That opinion dealt with two separate appeals relating to the award of attorneys' fees by this Court following the final approval of a settlement of the claims of members of a national class of builder-owners against manufacturers of plumbing fixtures. Friendswood Development Company (Friendswood) and Humble Oil & Refining Company (Humble) appealed from the award by this Court of fees to attorneys Harold E. Kohn and David Berger and their law firms [1], and attorneys of the firm of Thoma, Schoenthal, Davis, Hockenberg & Wine appealed from this Court's refusal to award any fees to them. The orders awarding fees to attorneys Kohn and Berger and denying fees to the Thoma attorneys were vacated by the Third Circuit, and it is these matters which have been remanded for further proceedings consistent with that Court's opinion.

The original opinion of this Court is reported in Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Corp., 341 F.Supp. 1077 (E.D.Pa.1972). That opinion was concerned with various applications for attorneys' fees and expenses. No appeals were taken from the rulings of this Court which awarded expenses to the Settlement Committee, which, inter alia, allowed reimbursement from the settlement fund of expenses incurred by Mr. Kohn and eleven other attorneys or firms who had filed suits in this litigation and which denied in toto ten other petitions, besides that of the Thoma firm, also seeking the award of attorneys' fees from the settlement fund.

In its opinion, the Third Circuit first rejected the contention advanced by Friendswood and Humble that this Court lacked authority to award any fees at all to petitioners Kohn and Berger from that portion of the settlement fund to be distributed to claimants who would receive distributions from the fund but who either did not file suit or were not included as settling parties. In approving an award payable directly to attorneys for services to unrepresented claimants, the Third Circuit recognized

---

1. Friendswood and Humble had not filed suit against the defendants but have duly filed claims permitting them to share in the distribution of the settlement fund.

that a district judge is empowered to exercise his informed discretion in awarding such fees and that any successful challenge to his determination must show that he abused that discretion. 487 F.2d at 166. However, the Third Circuit further held that in making an award to petitioners Kohn and Berger, this Court had not followed proper standards and directed that an evidentiary hearing should be held on remand so that there might be an evidentiary basis for applying such standards.

■ In discussing the proper standards which would govern the award of fees in a case of this sort, the Third Circuit said that the first inquiry of the Court should be into the hours spent by the attorneys, including how many hours were spent in what manner by which attorneys. 487 F.2d at 167. After determining the time spent, the district court should then undertake to fix an hourly rate of compensation to be applied to the hours worked. While the amount thus found to constitute reasonable compensation should be the "lodestar" of the Court's fee determination, at least two other factors should be taken into account in computing the value of attorneys' services, namely the contingent nature of success and the extent, if any, to which the quality of an attorney's work mandates either increasing or decreasing the amount to which the Court has found the attorney reasonably entitled. 487 F.2d at 168. Finally, after determining the total reasonable value of an attorney's services in securing recovery of a fund for the class, the Court should determine what portion of that amount should be paid by the unrepresented claimants. 487 F.2d at 169.

Following remand, the relatively small claim of the Thoma firm was settled.

Thus, the sole remaining question before the Court is the amount of the award to be made to petitioners Harold E. Kohn and David Berger as reasonable attorneys' fees, pursuant to the detailed standards and guidelines now established by the Third Circuit. In their original petition, these petitioners had sought fees from the total fund in the amount of some $3,037,000. For the reasons set forth in this Court's earlier opinion, an award approximating $1,375,000 had been previously made, representing 20% of the portion of the fund to be paid to unrepresented claimants.[2] 341 F.Supp. at 1090.

■ Following remand of this matter, this Court permitted further discovery to be undertaken in light of the new standards established by the Third Circuit. Interrogatories were served and answered, and depositions of petitioner Berger and of various members of the Kohn firm and of the Berger firm were taken. Several formal pre-trial conferences were held in open court, and a detailed Pre-trial Order has been approved and filed. At the evidentiary hearing, numerous documents were admitted in evidence, and petitioner Kohn was the only witness called by either side to testify.[3] However, by agreement, all the depositions were made a part of the record.

As noted in this Court's original opinion, the settlement previously approved by the Court covered the claims of a nation-wide class of builder-owners asserted against the so-called short-line defendants and against the so-called full-line defendants except for Briggs Manufacturing Company. 341 F.Supp. at 1079–1080. When these matters were previously before the Court, the aggregate amount of the settlement fund was approximately $26,000,000.

2. Eleven other attorneys or firms had petitioned for the award of fees totalling in the aggregate in excess of $1,000,000. These petitions were denied *in toto*.

3. Neither side produced any expert testimony. As the Third Circuit noted, expert testimony is not necessary to establish the value of a lawyer's services, as a judge is presumed knowledgeable as to the fees charged by attorneys in general and as to the quality of legal work presented to him by particular attorneys. 487 F.2d at 169.

Following final approval of this settlement on April 7, 1972, petitioner Kohn undertook steps to press the claims of the builder-owner class against the one remaining full-line defendant. As a result of a corporate merger, the Celotex Corporation was at or about this time the successor to Briggs Manufacturing Company and was substituted for Briggs in those actions in this litigation in which Briggs had been named as a defendant.

On June 27, 1972, this Court designated petitioner Kohn and his associate Aaron M. Fine as lead counsel in the litigation against Celotex. Various discussions were thereafter held between counsel for Celotex and petitioner Kohn in an attempt to settle the outstanding builder-owner claims against this one remaining full-line defendant. These negotiations eventually led to a settlement with Celotex in the amount of $1,150,000. A settlement agreement dated November 27, 1972 was executed by counsel for Celotex and by Messrs. Kohn and Fine on behalf of a proposed national class of builder-owner claimants.

Following a hearing on February 16, 1973, this Court entered Settlement Order No. 74 on February 23, 1973, which gave preliminary approval to the proposed builder-owner settlement and appointed the plaintiffs in Civil No. 41,774 as the class representatives. Following due notice to the class, a hearing was held on August 3, 1973 to consider whether this settlement with Celotex should be finally approved. There was no opposition, and the Court indicated that it would give final approval to the settlement as submitted. Findings of Fact, Conclusions of Law, a Judgment and Settlement Order No. 77, formally approving the Celotex settlement, were entered on October 9, 1973.

At the time of the hearing held on August 3, 1973 to consider final approval of the Celotex settlement, the Court also had before it an application by petitioner Kohn for the award of attorneys'

fees and expenses from the Celotex settlement fund. As a decision had not by that date been handed down by the Third Circuit in the *Lindy Bros.* appeal and as Friendswood and Humble were objecting to the award of fees in connection with the Celotex settlement on the same grounds as they were asserting in the appeal, this Court determined that no award of fees would be made from the Celotex fund until the appeal had been decided.

At the evidentiary hearing held following remand, counsel agreed that the original fund and the Celotex fund should be treated, for purposes of deciding the questions before the Court, as a single fund and that the total time spent by petitioners should be aggregated. Thus, although there are separate petitions before the Court (one filed pursuant to Settlement Order No. 21 and one filed pursuant to Settlement Order No. 74), only one award will be made.[4] The combined fund produced by the efforts of the petitioners, including interest, is now approximately $29,300,000, and the total time expended by the petitioners in producing such combined fund through March 24, 1974 is 6,487 hours of attorneys' time and 1,235 hours of paraprofessional and law students' time.

## I

## THE TIME FACTOR

In detailing in its *Lindy Bros.* opinion the standards that should guide the trial judge in awarding fees to attorneys successfully concluding class suits, the Third Circuit has directed that the first inquiry of the court should be into the hours spent by the attorneys. Not only should the court inquire as to the number of hours spent, but it should also determine in what manner the time was expended and by which attorneys.

From the evidence, this Court finds that the total time spent by the Kohn firm and the Berger firm through March 20, 1974, classified under appropriate specific categories, is as follows (in hours):

4. Allocation of the fee awarded to the separate funds will be made at a later date and will be determined on a proportional basis.

| | Category | Total Time | Kohn Firm | Berger Firm |
|---|---|---|---|---|
| 1. | Pleadings | 87.00 | 68.50 | 18.50 |
| 2. | Discovery | 1,609.55 | 973.75 | 635.80 |
| 3. | Court Appearances | 604.65 | 458.75 | 145.90 |
| 4. | Settlement | 531.20 | 400.00 | 131.20 |
| 5. | Fee Agreements | 66.00 | 55.50 | 10.50 |
| 6. | Fee Application and Appeal | 305.00 | 219.75 | 85.25 |
| 7. | Clients' Claim Forms | 126.50 | 16.50 | 110.00 |
| 8. | Interventions | 181.20 | 16.50 | 164.70 |
| 9. | Settlement Administration | 839.25 | 839.25 | —— |
| 10. | Briefs and Legal Research | 433.35 | 414.75 | 18.60 |
| 11. | General Matters | 1,686.33 | 1,052.25 | 634.08 |
| 12. | Other Appellate Proceedings | 17.50 | 17.50 | —— |
| | TOTAL— | 6,487.53 | 4,533.00 | 1,954.53 |

A similar breakdown of the total time spent during the same period by law students and paraprofessionals is as follows (by hours):

| Category | Total Time | Kohn Firm | Berger Firm |
|---|---|---|---|
| Fee Application | 16.00 | —— | 16.00 |
| Clients' Claim Forms | 991.50 | —— | 991.50 |
| General Matters | 227.70 | 60.00 | 167.70 |
| TOTAL— | 1,235.20 | 60.00 | 1,175.20 |

In valuing attorneys' services in a case such as this one, a court after determining the amount of time expended should then fix a reasonable hourly rate for each attorney who has worked on the case, taking into account each attorney's legal reputation and his status as a senior partner, junior partner or associate. 487 F.2d 167. In the Kohn firm, twenty different attorneys worked on this case. The reasonable hourly rate for the time of each is determined to be as follows:

| The Kohn Firm | | Year Admitted to Practice |
|---|---|---|
| Harold E. Kohn | $125.00 | 1938 |
| Aaron M. Fine | 100.00 | 1949 |
| Dolores Korman | 70.00 | 1957 |
| Stuart H. Savett | 60.00 | 1964 |
| David H. Marion | 60.00 | 1964 |
| Herbert E. Milstein | 65.00 | 1961 |
| Arthur M. Kaplan | 35.00 | 1971 |
| Donald L. Weinberg | 35.00 | 1971 |
| Allen D. Black | 35.00 | 1967 |
| Michael D. Hausfeld | 35.00 | 1969 |
| Leonard Barrack | 35.00 | 1969 |
| Barney B. Welsh | 40.00 | 1968 |
| Stephen E. Haberfeld | 35.00 | 1971 |
| Helen H. Stern | 35.00 | 1967 |
| David H. Weinstein | 35.00 | 1969 |
| James A. Sutton | 65.00 | 1938 |
| Marcus Manoff | 60.00 | 1941 |
| Robert W. Maris | 50.00 | 1963 |
| John M. Elliott | 35.00 | 1966 |
| Edward F. Mannino | 35.00 | 1967 |

In the Berger firm, twelve different attorneys worked on this case. A reasonable hourly rate for the time of each of these attorneys is determined to be as follows:

| The Berger Firm | | Year Admitted to Practice |
|---|---|---|
| David Berger | $125.00 | 1938 |
| Herbert B. Newberg | 70.00 | 1962 |
| H. Laddie Montague, Jr. | 70.00 | 1964 |
| Howard L. Schambelan | 50.00 | 1965 |
| Gerald J. Rodos | 35.00 | 1971 |
| Sylvan M. Cohen | 100.00 | 1939 |
| Edward N. Polisher | 100.00 | 1923 |
| Phillip M. Shiekman | 100.00 | 1951 |
| Mayor Shanken | 70.00 | 1962 |
| Sidney Margulies | 70.00 | 1957 |
| Alan M. Lerner | 50.00 | 1966 |
| Murray A. Zatman | 35.00 | 1967 |

A further breakdown of the total time spent under each category to show which attorneys performed which services is as follows:

1. Pleadings

| | |
|---|---|
| Harold E. Kohn | 3.50 hours |
| Aaron M. Fine | 30.75 " |
| Dolores Korman | 34.25 " |
| Herbert B. Newberg | 16.50 " |
| H. Laddie Montague, Jr. | 2.00 " |
| Total | 87.00 hours |

2. Discovery

| | |
|---|---|
| Aaron M. Fine | 954.50 hours |
| Dolores Korman | 19.25 " |
| David Berger | 43.00 " |
| Herbert B. Newberg | 182.20 " |
| H. Laddie Montague, Jr. | 3.40 " |
| Alan M. Lerner | 387.70 " |
| Howard L. Schambelan | 19.50 " |
| Total | 1,609.55 hours |

3. Court Appearances

| | |
|---|---|
| Harold E. Kohn | 106.00 hours |
| Aaron M. Fine | 326.00 " |
| Dolores Korman | 10.25 " |
| Allen D. Black | 16.50 " |
| David Berger | 63.20 " |
| Herbert B. Newberg | 42.20 " |
| H. Laddie Montague, Jr. | 20.80 " |
| Alan M. Lerner | 17.20 " |
| Howard L. Schambelan | 2.50 " |
| Total | 604.65 hours |

4. Settlement

| | |
|---|---|
| Harold E. Kohn | 212.50 hours |
| Aaron M. Fine | 187.50 " |
| David Berger | 1.00 " |
| Herbert B. Newberg | 79.00 " |
| H. Laddie Montague, Jr. | 1.50 " |
| Alan M. Lerner | 49.70 " |
| Total | 531.20 hours |

5. Fee Agreements

| | |
|---|---|
| Harold E. Kohn | 17.00 hours |
| Aaron M. Fine | 26.50 " |
| Dolores Korman | 10.00 " |
| James A. Sutton | 1.50 " |
| Marcus Manoff | 0.50 " |
| Herbert B. Newberg | 1.50 " |
| Sylvan M. Cohen | 1.00 " |
| Edward N. Polisher | 0.50 " |
| Phillip M. Shiekman | 1.50 " |
| Mayor Shanken | 1.30 " |
| Sidney Margulies | 2.20 " |
| Murray A. Zatman | 2.50 " |
| Total | 66.00 hours |

6. Fee Application, Appeal and Remand

| | |
|---|---|
| Harold E. Kohn | 47.75 hours |
| Aaron M. Fine | 170.50 " |
| Dolores Korman | 1.50 " |
| David Berger | 13.00 " |
| H. Laddie Montague, Jr. | 72.25 " |
| Total | 305.00 hours |
| Paraprofessional time | 16.00 hours |

7. Clients' Claim Forms

| | |
|---|---|
| Aaron M. Fine | 12.00 hours |
| Dolores Korman | 4.50 " |
| Herbert B. Newberg | 106.50 " |
| Alan M. Lerner | 3.50 " |
| Total | 126.50 hours |
| Paraprofessional time | 991.50 hours |

8. Interventions

| | |
|---|---|
| Aaron M. Fine | 16.50 hours |
| Herbert B. Newberg | 141.70 " |
| H. Laddie Montague, Jr. | 18.30 " |
| Alan M. Lerner | 4.70 " |
| Total | 181.20 hours |

9. Settlement Administration

| | |
|---|---|
| Harold E. Kohn | 6.00 hours |
| Aaron M. Fine | 471.25 " |
| Dolores Korman | 19.25 " |
| Allen D. Black | 342.75 " |
| Total | 839.25 hours |

10. Briefs and Legal Research

| | |
|---|---|
| Aaron M. Fine | 370.50 hours |
| Dolores Korman | 44.25 " |
| Herbert B. Newberg | 11.80 " |
| H. Laddie Montague, Jr. | 1.80 " |
| Alan M. Lerner | 5.00 " |
| Total | 433.35 hours |

11. General Matters

| | |
|---|---|
| Harold E. Kohn | 291.25 hours |
| Aaron M. Fine | 517.75 " |
| Dolores Korman | 85.00 " |
| Stuart H. Savett | 15.75 " |
| David H. Marion | 23.75 " |
| Arthur M. Kaplan | 6.00 " |
| Michael D. Hausfeld | 5.25 " |
| David H. Weinstein | 0.50 " |
| Leonard Barrack | 39.25 " |
| Barney B. Welsh | 35.25 " |
| Stephen E. Haberfeld | 1.00 " |
| Helen H. Stern | 0.50 " |
| Robert W. Maris | 0.50 " |
| John M. Elliott | 22.25 " |
| Edward F. Mannino | 8.25 " |
| David Berger | 136.35 " |
| Herbert B. Newberg | 383.00 " |
| H. Laddie Montague, Jr. | 63.63 " |
| Alan M. Lerner | 32.60 " |
| Gerald J. Rodos | 18.50 " |
| Total | 1,686.33 hours |

12. Other Appellate Proceedings

| | |
|---|---|
| Aaron M. Fine | 17.50 hours |
| Total | 17.50 hours |

If the reasonable hourly rate for each attorney is multiplied by the number of hours each attorney spent, the dollar amounts for each category are as follows:

| | Category | Total | Kohn Firm | Berger Firm |
|---|---|---|---|---|
| 1. | Pleadings | $ 7,205.00 | $ 5,910.00 | $ 1,295.00 |
| 2. | Discovery | 135,524.50 | 96,797.50 | 38,727.00 |
| 3. | Court Appearances | 60,440.00 | 47,145.00 | 13,295.00 |
| 4. | Settlement | 53,557.50 | 45,312.50 | 8,245.00 |
| 5. | Fee Agreements | 6,340.00 | 5,602.50 | 737.50 |
| 6. | Fee Application and Appeal | 29,806.25 | 23,123.75 | 6,682.50 |
| 7. | Clients' Claim Forms | 9,145.00 | 1,515.00 | 7,630.00 |
| 8. | Interventions | 13,085.00 | 1,650.00 | 11,435.00 |
| 9. | Settlement Administration | 61,218.75 | 61,218.75 | —— |
| 10. | Briefs and Legal Research | 41,349.50 | 40,147.50 | 1,202.00 |
| 11. | General Matters | 150,585.35 | 100,647.50 | 49,937.85 |
| 12. | Other Appellate Proceedings | 1,750.00 | 1,750.00 | —— |
| | TOTAL— | $570,006.85 | $430,820.00 | $139,186.85 |

The prevailing charge for paraprofessional services in the Philadelphia area is $20 an hour. The dollar amounts for paraprofessional and law students' time would therefore be as follows:

| | |
|---|---|
| Fee Application— | $ 320.00 |
| Clients' Claim Forms— | 19,830.00 |
| General Matters— | 4,554.00 |
| Total | $24,704.00 |

The evidence further discloses that since March 20, 1974 the Kohn firm has spent additional time in connection with its fee application in the dollar amount of $31,600 and the Berger firm has spent similar additional time amounting to $9,054. Thus, the total figures for all categories to date are as follows:

| | |
|---|---|
| Attorneys' time | $570,006.85 |
| Paraprofessional and law students | 24,704.00 |
| Time spent since March 20, 1974 | 40,654.00 |
| Total | $635,364.85 |

The above findings as to hours spent and amounts have either been agreed to by way of stipulation between the parties or are not otherwise seriously disputed.[5] In opposing the pending applications for fees, Friendswood and Humble (hereinafter referred to as "the objectors") contend that none of the Berger time should be included in an award by the Court and that all the time for both firms in four different categories should likewise be excluded because such time conferred no benefit on the class as a whole. The four categories challenged are: No. 5—Fee Agreements, No. 6—Fee Application and Appeal, No. 7—Clients' Claim Forms and No. 8—Interventions. Thus, the objectors assert that the only categories and dollar amounts which the Court should consider in awarding fees are the following:

| Category | Kohn Firm |
|---|---|
| Pleadings | $ 5,910.00 |
| Discovery | 96,797.50 |
| Court Appearances | 47,145.00 |
| Settlement | 45,312.50 |
| Settlement Administration | 36,982.50 |
| Briefs and Legal Research | 40,147.50 |
| General Matters | 100,841.25 |
| Appellate Proceedings | 1,750.00 |
| Total | $374,886.25 |

Furthermore the objectors contend that the time charged by the Kohn firm is inflated and should be discounted by 20%. Thus, objectors assert that the proper amount due petitioners on the basis of the number of hours spent multiplied by a reasonable rate for each attorney would come to $299,909.00. On the other hand, petitioners contend that all the hours spent by both the Kohn firm and the Berger firm benefitted the class, and petitioners assert that in making the required initial determination this Court should use as the basis for further computations the figure of $635,364.85.

### (a) The Berger Contribution

The fee petitions presently before the Court were filed jointly on behalf of Harold E. Kohn and David Berger and their respective law firms. On December 21, 1966, petitioner Kohn filed suit in this District on behalf of a national class of builder-owners.[6] Civil No. 41774. Another action was filed by Kohn at the same time on behalf of a national class of public bodies. Civil No. 41773. These were the first national class actions instituted in this litigation.

---

5. In the Pre-trial Order, petitioners reserved the right to contend that higher hourly rates than shown might be appropriate and the objectors reserved the right to contend that these were the maximum hourly rates which the Court might find to be reasonable for the initial determination which the Court must make.

6. The statement in this Court's previous opinion that this original action was filed by both Kohn and Berger is incorrect.

About a month later, on January 20, 1967, petitioner Berger filed motions to intervene on behalf of intervenor plaintiffs in the public body suit and thereafter intervened on behalf of numerous clients in both suits. The intervenors included large, nationally known builder-owners as well as smaller builder-owners and housing authorities from all over the United States. Kohn and Berger agreed to and did in fact conduct the litigation jointly, although the Kohn firm was more active than the Berger firm and spent more time in conducting the litigation. Petitioners Kohn and Berger have entered into an agreement whereby the fees awarded to them by the Court and the fees charged by each of them to their clients will be shared equally.

The objectors argue that petitioner Berger did virtually nothing to benefit the class and that the Court should exclude all of Berger's time in making the required initial determination. They further assert that petitioner Berger will be adequately compensated for his time by contingent fees to be paid directly to him by his clients.

█ The record in this case does not support objectors' position. This Court finds that the time spent by petitioner Berger and members of his firm contributed materially to the creation of the settlement fund and that the services rendered by him and his firm were of substantial benefit to the class.

As discussed more fully hereinafter, petitioner Berger, like petitioner Kohn, has an unequalled national reputation as a plaintiffs' class action attorney.[7] His mere presence as a member of the attorneys' team representing the plaintiffs in and of itself would be of considerable benefit. Confronted with an additional opponent with the skill and experience of petitioner Berger, counsel for defendants were under much more pressure to agree to a settlement favorable to the claimants. Like petitioner Kohn, petitioner Berger was not only capable of successfully conducting a national class action litigation, but also was possessed of a visible track record which demonstrated his successes in this field. Petitioners Kohn and Berger were co-counsel in the brass mill tube antitrust litigation, in which Judge Fullam found that "The abilities and standing of petitioning counsel are very high." Philadelphia Electric Co. v. Anaconda American Brass Co., 47 F.R.D. 557, 559 (E.D.Pa. 1969). Petitioner Berger and his firm prosecuted the rock salt litigation, which was finally settled shortly before trial after all discovery had been completed and after the case had been fully pretried. City of Philadelphia v. Morton Salt Co. et al., Civil No. 33781 (E.D.Pa., filed July 1963). In Professional Adjusting Systems of America, Inc. v. General Adjusting Bureau, 352 F.Supp. 648, 651 (E.D.Pa.1972), Judge Newcomer referred to petitioner Berger as "one of the most able anti-trust lawyers in the country * * *."

From the evidence here, this Court finds that petitioner Kohn consulted with petitioner Berger at every stage of the proceedings. Kohn valued Berger's judgment and advice, and the briefs and pleadings filed during the early stages of the litigation were reviewed with Berger or members of his firm. Petitioner Berger's name appears as co-counsel for the plaintiffs in a large number of the briefs and pleadings filed with the Court. In the original settlement agreement which was approved by Settlement Order No. 21, petitioner Berger signed with petitioner Kohn as counsel for the settling plaintiffs.

As more fully discussed, *infra*, the intervention in this litigation by the many clients represented by petitioner Berger was of considerable benefit to the class as a whole. Without the broad, national base and the overall financial strength which resulted from the work done by petitioner Berger in connection with

7. A more detailed discussion of petitioner Berger's education, experience and reputation is set forth in that portion of this opinion dealing with the quality factor, *infra*.

these interventions, defendants would have been under less pressure to settle.

■ As the time records show, petitioner Berger and his firm quite clearly spent less time in connection with this litigation than did petitioner Kohn. The total Kohn time for attorneys is 4,533 hours through March 20, 1974 and the Berger figure for this same period is 1,954 hours. But the fact that Berger was not as active as Kohn and the fact that he spent less time does not support the objectors' contention that all of his time should be excluded. This Court finds that there was no duplication of time or unnecessary overlapping of the services rendered by these two law firms. Indeed, only because of the expertise and experience of both Berger and Kohn was this massive litigation concluded with such a relatively small expenditure of time. Petitioner Berger's efforts were productive in contributing to the creation of the settlement fund, and his time should be considered in the same manner as that of petitioner Kohn in determining what would be a reasonable fee to be awarded.

The objectors further argue that the time claimed by the Berger firm is not adequately supported by evidentiary proof. The evidence indicates that before April 1972, lawyers in the Berger firm rarely kept time records and that a large part of the time claimed by such firm results from a reconstruction. The objectors contend that such reconstruction is so unreliable that all of the Berger time should be excluded.

■■ Quite obviously, contemporary time records, kept on a day-by-day basis by individual attorneys, are the most accurate means of establishing the amount of time that a lawyer has devoted to a particular activity. But time records, although highly desirable, are not the only means of proving time spent in a multidistrict litigation of this sort. See In Re Four Seasons Securities Laws Litigation, 59 F.R.D. 657, 664 (W.D.Okl. 1973). Although mere estimates of time are not acceptable, an allowance of attor-

neys' fees may be based on a reconstruction, provided that the time records are substantially reconstructed and are reasonably accurate. See In Re Borgenicht, 470 F.2d 283, 284 (2d Cir. 1972).

The evidence here discloses that the reconstruction was carefully and accurately done. Correspondence, pleadings, briefs and other material in the files were reviewed by an attorney with experience in such matters and a time figure was assigned. Time records of other attorneys were examined, as were court records and transcripts where an attorney had appeared in court. Indeed, from the record as a whole, it appears that petitioner Berger and his firm probably spent more time than they are claiming in connection with this litigation.

As surprising as it seems that a firm with the reputation of the Berger firm rarely kept time records prior to 1972, the nature of Berger's practice provides an explanation for this practice. Representing primarily plaintiffs during the period in question, the Berger firm did not normally bill its clients on the basis of an hourly rate. Most cases were undertaken on a wholly contingent basis, and in some a retainer was paid at the outset. As time records played no part in ascertaining the ultimate fee, the firm in those years did not keep such records.

■ Certainly today, in view of the emphasis placed by the Third Circuit in its *Lindy Bros.* opinion on the time factor as the "lodestar" of a court's fee determination, every attorney who would seek an award of attorney's fees should keep complete and accurate time records. Nevertheless, failure to maintain such records prior to 1972 should not necessarily disqualify a petitioner from receiving any award at all. This Court finds that the reconstructions undertaken here were sufficient to permit the Court to consider the total time claimed by the Berger firm in the same manner as that claimed by the Kohn firm.

### (b) *The Challenged Categories*

■ In Category No. 5, petitioners have included time spent in negotiating fee agreements with their private clients, and in Category No. 7, time has been included which was spent in preparing claim forms for private clients. The objectors contend that the hours claimed in each category should be excluded by the Court in making its initial determination because such time did not contribute to the creation of the settlement fund or otherwise benefit the class. This Court would agree.

Petitioners Kohn and Berger represent litigants who will receive approximately 18.2% of the fund. Petitioners will receive fees from such clients amounting to $861,191, under negotiated private agreements which provide for the payment of contingent fees.[8] Petitioners seek to charge all members of the class for time spent negotiating these agreements. In order that their clients might be entitled to receive the amounts ultimately awarded to them (an aggregate sum of approximately $5,300,000), petitioners prepared and filed detailed claim forms. They similarly seek fees from the entire class for these services.

The time spent by petitioners in connection with both of these activities quite clearly was not of benefit to the class as a whole. The benefit was conferred on those litigants whom petitioners represented, and petitioners will be compensated for the time so expended under their private fee agreements. Thus, the time for both petitioners set forth under Categories 5 and 7 will be excluded by the Court in making the initial determination.

All other Categories, however, are properly chargeable to the entire class. In particular, this Court finds that these petitioners may properly claim time spent in applying to the Court for an award of attorneys' fees and also time spent in connection with interventions.

■ The objectors argue that time expended by petitioners in preparing and supporting their fee applications in this Court and in the Third Circuit Court of Appeals is antagonistic to the interests of the class. Such an argument misconceives the true nature of a proceeding such as the present one. Under the equitable fund doctrine, the court is empowered to compensate an attorney whose actions in commencing, pursuing and settling litigation benefit a class of persons not participating in the litigation. 487 F.2d at 165. A part of the attorney's services would include time spent in preparing his fee petition, presenting it to the Court and defending it both at the trial and at the appellate level. Such time is a part of the administrative expense necessarily incurred in administering the fund. Under the detailed standards and guidelines laid down by the *Lindy Bros.* opinion, a substantial amount of work must necessarily be undertaken by a petitioning attorney, if the trial court is to have before it all the pertinent facts necessary for a proper decision. Services performed in this connection are indeed of benefit to the class as a whole because they enable the Court to make its determination on the basis of a full and accurate presentation of all relevant facts. This is not to say, however, that the final *rate* of compensation will be the same as it might be for other services performed by the attorneys.[9] But the time properly expended by petitioners in presenting these important issues to the Court should initially be included.

Under the position espoused by the objectors, a petitioning attorney would

---

8. At the time of the earlier hearing, this figure was $802,707. The increase is attributable to the later Celotex settlement and other additions to the fund.

9. A further discussion of the reasonableness of any increase of this part of the initial determination is to be found in a later section of this opinion.

receive no compensation whatsoever for time spent in compiling the extensive data needed by the Court, in preparing briefs and exhibits and in appearing in court to explain the basis for the application. Such a rule would encourage the expenditure of minimum time and effort by a petitioning attorney in connection with an important phase of the administration of the fund. The result under such circumstances could very well be an excessive or improperly allocated award, not based on all relevant facts and circumstances. Where, as here, substantial fees are sought from a multi-million dollar fund, the benefit to the class as a whole from the performance of these services in a thorough and careful manner makes it appropriate for the additional cost to be charged to the fund.

Similarly, time spent by both petitioners in connection with interventions was beneficial to the class as a whole. Many of these intervenors were substantial national firms and afforded broad geographical representation to the class. Before the settlement agreement was reached, defendants vigorously opposed the formation of a national class. In P. D.Q. Inc. of Miami v. Nissan Motor Corp., 61 F.R.D. 372 (S.D.Fla.1973), the Court refused to permit the case to proceed as a national class action because the Court was not satisfied that the financial strength of the representative parties was sufficient to support the considerable expense of conducting a complicated antitrust case.

Faced with many additional litigants with sufficient financial resources to finance the cost of notice to the class and also the cost of a protracted trial, defendants in this case were under much more pressure to settle than otherwise. In its recent decision in Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the Supreme Court held that class representatives must pay the cost of the notice required by Rule 23 in a case such as this one.

The cost of notice in this case was approximately $150,000, a sum which was paid from the settlement fund. Had there been no settlement, plaintiffs and intervenors would have been required to advance this sum if this litigation were to go ahead as a national class action.

### (c) *The Kohn Time*

■ The objectors further argue that the time recorded by the Kohn firm was inflated and that the total figures should arbitrarily be reduced by 20%. There is no support in the record for this contention.

■ The objectors point out that on occasion petitioner Kohn (and also petitioner Berger) recorded as much as 16 hours a day. They urge that any such hours recorded must necessarily have been inflated, and they ask for an across-the-board reduction of all the time claimed by the Kohn firm. This Court does not find it surprising that on occasion petitioners or members of their law firms recorded as much as 16 hours. Whether or not counsel for the objectors or their opponents in other cases are accustomed to working more than 6 or 8 hours a day, this Court would note from its experience with trial attorneys engaged in major litigation that it is not at all unusual for a trial lawyer to work as much as 16 hours during a particular 24-hour period. In any event, the testimony and affidavits in the record fully support the time claimed by both petitioners. No such arbitrary reduction as sought by the objectors will therefore be made.

■ Petitioners have estimated that an additional 100 hours of Mr. Fine's time will be necessary to complete final administration of the settlement. The objectors oppose any allowance for this future time. Obviously, additional attorneys' time will be required for the

distribution of the remaining portion of the fund to the many thousands of claimants involved. From its knowledge of these proceedings, this Court concludes that 100 hours is a reasonable estimate and that the allowance should be made as requested.

(d) *Summary—The Initial Determination*

For the reasons stated, this Court finds that the initial required determination based on the number of hours spent by each individual attorney is as follows:

(1) Lawyers' time to March 20, 1974

| Category | Kohn Firm | Berger Firm | Total |
|---|---|---|---|
| Pleadings | $ 5,910.00 | $ 1,295.00 | $ 7,205.00 |
| Discovery | 96,797.50 | 38,727.00 | 135,524.50 |
| Court Appearances | 47,145.00 | 13,295.00 | 60,440.00 |
| Settlement | 45,312.50 | 8,245.00 | 53,557.50 |
| Fee Application and Appeal | 23,123.75 | 6,682.50 | 29,806.25 |
| Interventions | 1,650.00 | 11,435.00 | 13,085.00 |
| Settlement Administration | 61,218.75 | ——— | 61,218.75 |
| Briefs and Legal Research | 40,147.50 | 1,202.00 | 41,349.50 |
| General Matters | 100,647.50 | 49,937.85 | 150,585.35 |
| Other Appellate Proceedings | 1,750.00 | ——— | 1,750.00 |
| Sub-Total | $423,702.50 | $130,819.35 | $554,521.85 |

| | |
|---|---|
| (2) Paraprofessional and law students | 4,874.00 |
| (3) Time spent since March 20, 1974 | 40,654.00 |
| (4) Future time | 10,000.00 |
| TOTAL— | $610,049.85 |

———◆———

 All of the activities listed above contributed to the ultimate result. The aggregate amount of the initial determination is thus $610,049.85, which this Court finds to be reasonable compensation based solely on considerations of the time expended without reference to other factors.

## II

## THE CONTINGENCY FACTOR

Once the Court has made the required initial determination, there are two other factors to be considered in determining reasonable compensation. The first of these is the contingent nature of success. 487 F.2d at 168.

As the Third Circuit has pointed out, the contingency factor is of special significance in a case such as this one where the petitioners had no private agreements which guaranteed payment if no recovery were ultimately obtained. What the Court must do is assess from the evidence the extent to which the attorneys' compensation should be increased to reflect the unlikelihood of success. If the contingency is slight or if the initial amount found to constitute reasonable compensation is a large proportion of the total recovery, then the Court may conclude that an increased allowance for the contingent nature of the fee should be minimal or that there should be no increase at all. See 487 F. 2d at 168.

 Here the amount initially found to constitute reasonable compensation on a time basis is a very small proportion

of the total recovery, approximately 2%. Furthermore, the contingency was considerable in this case, and this Court has therefore concluded that there should be a substantial increase because of this factor.

In approving the builder-owner settlements, this Court made specific findings of fact concerning the likelihood of the plaintiffs' success in this litigation.[10] Whether or not the objectors are now bound by these earlier determinations, the record now before the Court fully supports the express findings previously made. Accordingly, the following factors are hereby adopted in support of this Court's conclusion that the risk was considerable when petitioners undertook to negotiate a settlement of this massive litigation:

(1) the uncertainty of the class members' ability to prove liability and damages;

(2) the existence of other categories of claimants in this litigation contending that they and not the builder-owners were entitled to any recovery against the defendants;

(3) this Court's prior decision in Maricopa County v. American Radiator & Standard Sanitary Corp., 323 F.Supp. 381 (E.D.Pa.1970), and Mangano v. American Radiator & Standard Sanitary Corp., 50 F.R.D. 13 (E.D.Pa.1970), aff'd, 438 F.2d 1187 (3d Cir. 1971);

(4) the fact that the time period and range of products encompassed within the government's evidence in the criminal case was drastically more limited than the allegations in the complaints herein; and

(5) the settling defendants' denials of any violation of the antitrust laws and any overcharges, and the fact that they could have been expected to litigate all issues fully, including appeals if necessary.

The objectors argue that liability could have been easily established because criminal prosecutions had preceded the filing of these civil suits. But only three of the sixteen defendants were convicted. The other thirteen entered pleas of *nolo contendere*. The Third Circuit has recognized "that convictions following pleas of *nolo contendere* are not entitled to the same evidentiary position as convictions following not guilty pleas and that even where violation of the antitrust laws is established, civil plaintiffs must prove that they were injured by the violation." 487 F.2d at 168, n. 12.

In the full-line indictment, the government charged a conspiracy lasting for some four years, from 1962 to 1966. However, the evidence of price-fixing submitted by the government at the criminal trial was limited substantially to the period from mid-September 1962 until June or July, 1963, some nine months. By the end of 1963, the defendants had learned that funds of their trade association had been embezzled by its Secretary, William Kramer, and that Kramer had attempted to blackmail the defendants by threatening to furnish the government with evidence of price-fixing if he were prosecuted. Since these threats were reported to the Justice Department in late 1963, it is hardly conceivable that defendants would have continued their alleged price-fixing conspiracy after that date. In particular, defendant American Standard instituted extraordinary procedures in late 1963 to insure that no price changes were in any way the result of discussions among competitors.

At the criminal trial, the government did not present evidence that the defendants had agreed among themselves concerning the prices actually charged. (See Petitioners' Exhibit No. 27.) The proof offered did no more than show an agreement to fix prices which was not put into effect and the government argued successfully that such an agreement constituted a violation of the anti-

---

10. Paragraph 17 of Findings of Fact filed May 17, 1972 and Paragraph 16 of Findings of Fact filed October 9, 1973.

trust laws.[11] Unlike most criminal price-fixing prosecutions, the available government proof here did not readily lend itself to a showing of damages by plaintiffs in subsequent civil actions.

Thus, this was not a case where plaintiffs received from the government on a silver platter the evidence necessary to prove their claims against the three convicted defendants, much less against the thirteen which had entered pleas of *nolo contendere*. Substantial problems of proof were present as to both liability and damages. Yet petitioners were able to negotiate settlements with all defendants which yielded funds producing $10.75 for each bathroom unit purchased by claimants during the full four-year period.

Plaintiffs were faced with yet another substantial legal hurdle. Because of the nature of the plumbing fixture industry, there were claimants at various different levels of the chain of distribution of these products. Ultimately, separate classes of wholesalers, of plumbing and other contractors, of public bodies and of builder-owners were formed. Assuming that violations of the antitrust laws could be proved, the further question remained concerning which purchaser at the various different levels of the chain had the right to collect damages. Before settlement was reached, representatives of each of these prospective classes claimed that they alone were entitled to the sole recovery.

This problem of standing, which arose under the decision of the Supreme Court in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), became of more immediate concern in this litigation when the decisions were rendered by this Court in Mangano v. American Radiator & Standard Sanitary Corp., *supra*, and Maricopa County v. American Radiator & Standard Corp., *supra*. Counsel for the defendants were well aware of the import of these decisions and consistently took the position that they would assert this defense against builder-owner plaintiffs.

That the pass-on problem was an extremely troublesome one is shown by the testimony of Paul R. Connolly in this proceeding.[12] Characterized by counsel for the objectors as "one of the nation's outstanding trial attorneys, who was actively involved in this litigation throughout" and as a "third-party witness",[13] Mr. Connolly was subpoenaed by the objectors. He testified that before settlement was reached all counsel were concerned about the effect of the *Hanover Shoe* decision, that at the time it was not known who would be a proper party plaintiff and that whether the builder-owners had proper standing was debated a great deal in his office. Mr. Connolly asserted that the fact that the government wins a criminal or civil antitrust case does not necessarily mean that a treble damage case can be won. He specifically referred to a recent antitrust case in which he had successfully represented a defendant. Although the government had succeeded in an action against this defendant, Mr. Connolly had persuaded the Court to grant summary judgment in favor of his client "on the ground that the plaintiff consumers in California had no standing."

Finally, serious questions were presented at the outset of this litigation as to whether these suits could have been maintained as a national class action. In some of the cases that had

---

11. In affirming the criminal convictions, the Third Circuit discussed at some length the strength of the defendants' economic evidence. United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174, 197 (3d Cir. 1970), cert. den. 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971). The Court noted that such evidence "could hardly have been easily dismissed by the trier of fact."

12. Mr. Connolly's deposition was taken before trial and by agreement was introduced in evidence.

13. Post-hearing Memorandum of Claimants-Objectors, page 32. Later in their Memorandum, the objectors termed Mr. Connolly's testimony "candid" and "disinterested".

been filed, the plaintiffs had sought state-wide class actions. In Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 464 (E.D.Pa. 1968), the Court had refused to certify a national builder-owner class on the ground that it was unmanageable, and the Court had limited the class to builder-owners in the Eastern District of Pennsylvania. As was noted by the Court in City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974), different competitive climates may exist in the various different jurisdictions where actions of this sort are instituted. The settlement reached here by petitioners satisfactorily resolved these contested class action questions in favor of the formation of a single national class.

Armed with the acutely perceptive vision of hindsight, the objectors argue that petitioners were faced with substantially no risk at all as to any of these questions when they undertook settlement negotiations with defendants. But in assessing the contingent nature of success in a case of this sort, the Court must weigh the factors as they existed before the original settlement agreement was executed on February 4, 1970 and before the Celotex settlement agreement was executed on November 27, 1972. When viewed in that perspective, the contingent nature of success was considerable.[14] Accordingly, this Court concludes that a substantial increased allowance should be made because of the contingency factor.

## III

### THE QUALITY FACTOR

██ The second additional factor which this Court must consider is the

extent, if any, to which the quality of an attorney's work mandates increasing or decreasing the amount of the initial determination. In considering this factor, the court should assess the complexity and novelty of the issues presented, the quality of the work that the judge has been able to observe and the amount of the recovery obtained. 487 F.2d at 168. In this case, there were numerous in-court proceedings which occurred before settlement was reached, and these can be weighed and considered from a review of the reported opinions in this case, from the exhibits and other evidence in the present record and from what the undersigned judge has been able to observe since this case was assigned to him.[15]

### (a) *History and Complexity of the Litigation*[16]

On December 21, 1966, petitioner Kohn filed two suits in this Court, one on behalf of a national class of builder-owners and the other on behalf of a national governmental class. These were the first national class actions filed in this litigation. On January 20, 1967, petitioner Berger filed motions to intervene on behalf of intervenor plaintiffs in the builder-owner suit and thereafter filed interventions from time to time in that action and also in the action brought on behalf of public body plaintiffs.

On March 28, 1967, the defendants filed a motion seeking to stay all civil proceedings until the criminal case against them in the Western District of Pennsylvania had been concluded. Chief Judge Clary granted an interim stay and the cases were thereupon assigned to Judge John W. Lord, Jr. On May 16,

---

14. This finding applies to both the original settlement and the Celotex settlement. Celotex (or its predecessor Briggs) held out adamantly until petitioners in the spring of 1972 undertook discovery in preparation for trial, when Celotex finally agreed to begin settlement discussions.

15. The undersigned judge was assigned to handle this litigation, commencing in June 1970, by the Judicial Panel on Multidistrict

Litigation. Shortly after they were filed, these cases had been assigned to Judge (later Chief Judge) John W. Lord, Jr., who conducted all proceedings in the litigation until it was re-assigned.

16. Many of the findings contained in this portion of the opinion were also made in this Court's earlier opinion. 341 F.Supp. at 1087–1089.

1967, Judge Lord heard argument on the motion for a stay, which was vigorously opposed by petitioners. The motion was denied on June 7, 1967. Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 269 F. Supp. 540 (E.D.Pa.1967).

Defendants then applied to Judge Rosenberg, before whom the criminal cases were pending in the Western District of Pennsylvania, seeking an injunction barring further proceedings in the civil cases in Philadelphia until the criminal case was concluded. On July 28, 1967, Judge Rosenberg did enjoin the plaintiffs in these civil actions from proceeding with discovery in their treble damage suits. United States v. American Radiator & Standard Sanitary Corp., 272 F.Supp. 691 (W.D.Pa.1967). Petitioners and others promptly appealed to the Third Circuit, which thereafter reversed the decision of Judge Rosenberg. United States v. American Radiator & Standard Sanitary Corp., 388 F.2d 201 (3d Cir. 1967), cert. den. 390 U.S. 922, 88 S.Ct. 857, 19 L.Ed.2d 983 (1968).

On August 18, 1967, the defendants had also petitioned the Third Circuit, seeking the issuance of a writ of mandamus against Judge Lord's denial of a stay. Petitioners opposed this requested relief, and the application was later denied. Other stays were sought by defendants and successfully opposed by petitioners.

In 1968 and 1969, petitioners actively pressed discovery proceedings. Mr. Connolly testified that in preparing the case for trial, petitioner Kohn was "very much on top of the case." A motion was filed for the production of magnetic tape recordings of conversations between William E. Kramer, of the Plumbing Fixture Manufacturers Association, and various members and associates of that organization. In Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., 291 F.Supp. 247 (E.D.Pa.1968), Judge Lord held that such tapes were subject to production, reserving decision as to some of the tapes with respect to which the defend-

ants claimed an attorney-client privilege. Subsequently, Judge Lord ordered the production of those tapes as well. 294 F.Supp. 1148 (E.D.Pa.1969).

Petitioners likewise appeared before the Judicial Panel on Multidistrict Litigation and successfully urged that all the plumbing fixture cases be transferred to the Eastern District of Pennsylvania under 28 U.S.C. § 1407. Such transfer was ordered by the Panel on September 13, 1968, which noted that Judge Lord had actively conducted pretrial proceedings in the cases and had adopted a comprehensive discovery schedule, and that as a result of interventions, the actions in the Eastern District of Pennsylvania then involved more claims for relief than were involved in any other District. In Re Plumbing Fixture Cases, 295 F.Supp. 33 (Jud. Pan.Mult.Lit. 1968).

Petitioners had sought to commence settlement negotiations with defendants at an early date, but these discussions had been postponed so that the various questions relating to stays and to discovery could be first resolved. In the fall of 1969, petitioners undertook to resume settlement negotiations, culminating in a meeting at the Engineers' Club in New York City on October 13, 1969. At that time, a large group of plaintiffs' attorneys met with various defendants' attorneys, and an offer of $15,000,000 was made on behalf of the full-line defendants to settle all of the many suits that had been filed. Because of the divergent views expressed at that meeting by the many plaintiffs' attorneys present, nothing definite resulted from these initial discussions. However, it was generally agreed by all plaintiffs that the amount proposed would not be acceptable as a total settlement of the entire litigation.

Efforts were then undertaken to keep settlement negotiations alive. Another meeting was held on October 16, 1969 at which separate groups of plaintiffs were formed, consisting of builder-owners, public bodies, contractors, wholesalers and home-owners. A meeting was next

held in petitioner Kohn's office on October 29, 1969, attended by various attorneys for builder-owner plaintiffs and by counsel for three principal defendants. As the wholesalers, contractors and public body groups had indicated that they wanted to negotiate separately, petitioner Kohn discussed with defense counsel the possible settlement of the builder-owner claims only for an amount in excess of $20,000,000.

The ensuing negotiations were long and difficult. Further discussions eventually led to the $21,500,000 settlement offer made by the major defendants other than Briggs Manufacturing Company. When various plaintiffs' attorneys could not agree on either this amount or upon the terms of a formal settlement agreement, petitioner Kohn continued the discussions with defendants' counsel, leading eventually to the execution of an agreement dated February 4, 1970 between petitioners Kohn and Berger and the settling defendants.[17] Under this agreement, the obligations of the defendants were made contingent upon satisfactory resolution of the claims of wholesalers, contractors, public bodies and the purchasers of structures. In succeeding weeks, both petitioners were active in securing the assent of many other builder-owner plaintiffs to the terms of the settlement.[18]

Petitioner Kohn discussed settlement possibilities and strategy with petitioner Berger at every stage of the negotiations. Thus, although petitioner Kohn and Mr. Fine played the active role of meeting with counsel for defendants and for other classes of plaintiffs, the advice and counsel of petitioner Berger contributed directly to the settlement finally achieved.

At a later date, negotiations were conducted with attorneys for the short-line defendants. On August 5, 1970 and November 12, 1970, agreements providing for a settlement fund in the amount of $1,400,000 were executed between petitioners Kohn and Berger and the short-line defendants.

These settlements were formally presented to the Court for preliminary approval at a hearing on May 17, 1971, resulting in the entry of Settlement Order No. 21. Following notice to the prospective members of the class, the settlements were finally approved at a hearing held on April 7, 1972. Counsel for Friendswood and Humble were present and did not object to the settlement. Approval of the settlement was embodied in Settlement Order No. 41, a Judgment, and Findings of Fact and Conclusions of Law which were thereafter filed.

As discussed hereinabove, later negotiations with counsel for the Celotex corporation led to the settlement with that defendant as well. On August 3, 1973, the Celotex settlement (which was not opposed by any claimant) was likewise approved by the Court, and papers of final approval were filed on October 9, 1973.

Petitioners were here participating in no run-of-the-mill class suit.[19] The plumbing fixture antitrust litigation has involved the largest number of cases of any matter that has ever come before the Judicial Panel on Multidistrict Litigation. 374 cases are included in this one massive litigation. Over 10,000 claims were filed in the builder-owner settlement alone.

Complex and novel questions arose because of the large numbers of plaintiffs and classes of plaintiffs competing with each other to establish standing. See Mangano v. American Radiator & Stand-

---

17. In his testimony, Mr. Connolly commented on the "extreme bargaining skill" required for negotiation of this settlement.

18. Under the settlement agreement, any settling defendant was entitled to withdraw if sufficient acceptances had not been obtained within 30 days.

19. Counsel for the objectors did not enter an appearance in this case until shortly before the hearing on April 7, 1972, a fact which may explain their characterization of these proceedings as a "relatively simple straight horizontal price-fixing case."

ard Sanitary Corp., *supra,* and Maricopa County v. American Radiator & Standard Sanitary Corp., *supra.*

With national reputations built as a result of their extensive experience in litigation of this nature, petitioners Kohn and Berger were able to provide the leadership necessary so that the many builder-owner plaintiffs and the other plaintiffs as well might unite in presenting their claims against the defendants. Because of the complexity of the competing interests of plaintiffs at various levels of the chain of distribution of plumbing fixtures, no settlement would have been possible without the coordination by all the plaintiffs of their efforts.

In the *Lindy Bros.* opinion, the Third Circuit specifically approved Judge Wyzanski's observation in Cherner v. Transitron Electronic Corp., 221 F.Supp. 55, 61 (D.Mass.1963), that in complicated cases producing large recoveries, it is not "just" to make a fee "depend solely on the reasonable amount of time expended." The present litigation was indeed a complicated one which produced a very substantial recovery for the claimants.

### (b) *The Quality of the Work*

Both petitioner Kohn and petitioner Berger were highly skilled and experienced attorneys, with outstanding academic records. Members of their firms were likewise highly competent practitioners.

Petitioner Kohn was a 1934 Phi Beta Kappa graduate of the University of Pennsylvania. He received an LL.B. from that University's law school in 1937 and was first in his class, a member of the Order of the Coif and an editor of the Law Review. When this litigation commenced, petitioner Kohn was a senior member of the Philadelphia law firm of Dilworth, Paxson, Kalish, Kohn and Levy. In July 1969, he and other attorneys who had been associated with the Dilworth firm formed the professional association of Harold E. Kohn, P.

A. Petitioner Kohn is a member of various bar associations and is a Fellow in the International Academy of Trial Lawyers. He is a member of the Special Committee of the American Bar Association on Multidistrict and Protracted Litigation and has lectured frequently for the American Bar Association and other groups on class and antitrust litigation.

Petitioner Berger was a 1932 honors graduate of the University of Pennsylvania. In 1936, he received an LL.B. from that University's law school where he was a member of the Order of the Coif and an editor of the Law Review. He was a senior partner in the firm of Cohen, Shapiro, Berger, Polisher and Cohen until he left in 1970 and formed the professional association of David Berger, P.A. Petitioner Berger is likewise a member of various bar associations and was Chancellor of the Philadelphia Bar Association in 1963. He was City Solicitor of the City of Philadelphia from 1956 until 1963. He has served since 1965 as a member of the United States Supreme Court Advisory Committee on the Federal Rules of Evidence.

A stockholder and officer of Harold E. Kohn, P.A., Aaron M. Fine, who has been particularly active in this litigation, is a 1943 Phi Beta Kappa graduate of the University of Pennsylvania. He received an LL.B. from that University's law school in 1948, was second in his class, a member of the Order of the Coif and an editor of the Law Review. He became a member of the Dilworth firm in 1955. He has lectured on class actions for the American Bar Association and has been on various class action panels of the Practicing Law Institute and of the Ninth Circuit Judicial Conference. Within the past year, Mr. Fine argued before the Supreme Court the leading class action case of Eisen v. Carlisle and Jacquelin, *supra.*

Herbert B. Newberg was a partner at Cohen, Shapiro, Berger, Polisher and Cohen until he left that firm to join the Berger firm in 1970. Mr. Newberg was

a 1958 graduate of the University of Pennsylvania Wharton School and was first in his class. He received his law degree from Harvard Law School in 1961 and was an Assistant City Solicitor of the City of Philadelphia from 1962 until 1964, when he joined Mr. Berger in the practice of law.

Other attorneys in the Kohn firm and in the Berger firm also possessed impressive academic backgrounds, including attorneys Korman and Black of the Kohn firm and attorneys Montague and Lerner of the Berger firm. No attempt will be made to detail the backgrounds of all the other attorneys who rendered beneficial services to the class. Suffice it to say that such other attorneys, although younger and not as experienced as petitioners Kohn and Berger, were well qualified to render the legal services for which compensation is sought and that their work was under the supervision and direction of the petitioners themselves.

Not only were petitioners' educational backgrounds and academic attainments of the highest order, but also petitioners have experience in national class action multidistrict litigation that can hardly be equalled by any attorney in the country. 28 U.S.C. § 1407 and the Judicial Panel on Multidistrict Litigation are a direct outgrowth of the avalanche of antitrust suits filed against electrical equipment manufacturers in the early 1960's. Neal and Goldberg, The Electrical Equipment Antitrust Cases: Novel Judicial Administration, 50 A.B.A.J. 621 (1964); Peterson and McDermott, Multidistrict Litigation: New Forms of Judicial Administration, 56 A.B.A.J. 737 (1970). Both petitioner Kohn and petitioner Berger actively participated in the electrical equipment cases in the early 1960's, and they have continued to specialize in the relatively new field of multidistrict litigation since then. Petitioner Kohn, Mr. Fine and Miss Korman tried the first of the electrical equipment cases, obtaining a judgment, after trebling of the jury verdict, amounting to some $29,000,000. Philadelphia Electric Co. v. Westinghouse Electric Corp., 1964 Trade Cases, ¶71,123 (E.D.Pa. 1964). Reference has previously been made to both petitioners' success in the case of Philadelphia Electric Co. v. Anaconda American Brass Co., *supra,* and to petitioner Berger's participation in the rock salt litigation, City of Philadelphia v. Morton Salt Co., *supra,* and in the case of Professional Adjusting Systems of America, Inc. v. General Adjusting Bureau, Inc., *supra.*[20]

In City of Philadelphia v. Chas. Pfizer & Co., 345 F.Supp. 454, 484–485 (S.D. N.Y.1972), Judge Wyatt noted that "Kohn is accepted as an able and experienced antitrust specialist who has a high standing at the bar." Judge Broderick, in a Memorandum and Order filed on December 7, 1973, in Goldstein v. Alodex, Civil No. 71–1857 (E.D.Pa.), said that the "standing of the Harold E. Kohn firm in class action litigation is well known and need not be extensively detailed herein." Mr. Connolly testified that petitioner Kohn was "a very, very able class antitrust lawyer" and "a lawyer of national reputation."

Petitioners Kohn and Berger and various members of their firms have filed many briefs and pleadings which have been reviewed by the undersigned judge and have personally appeared before the undersigned on many occasions since June of 1970. The record here also includes various pleadings, briefs and memoranda filed before that date.

---

20. More recently petitioner Kohn successfully tried the class action of Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3d Cir.), cert. den. 409 U.S. 874, 93 S.Ct. 120, 34 L. Ed.2d 126 (1972), and Mr. Fine successfully tried the class action in Gould v. American Hawaiian Steamship Co., 362 F.Supp. 771 (D.Del.1973). Although petitioners' participations in these trials occurred after the settlements were achieved in this case, they illustrate that petitioners, with their extensive experience in similar matters, would not hesitate to proceed to trial in complex class actions in which a favorable settlement could not be reached, a fact known to defendants when they settled these cases.

From a review of these written materials and from personal observations, this Court concludes that petitioners have exhibited an unusual degree of skill in conducting these proceedings. They were aggressive and imaginative throughout. Because the work has been efficient and of an atypical quality, the aggregate hourly compensation should be increased. Indeed, the total amount of time spent by petitioners in this case is relatively low when one considers what was accomplished and the number of years that have elapsed since the litigation was commenced. Certainly, economy of effort should not be penalized. Less experienced and less skillful attorneys would undoubtedly have expended much more time in achieving the same result than did petitioners.

### (c) *The Amount of the Recovery*

Antitrust settlements are traditionally based on an estimate of single damages only. City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974). The $29,300,000 fund in this case amounts to approximately $10.75 for a single bathroom unit for the full four-year period covered by the indictment filed by the government against the full-line defendants. As previously discussed, the evidence offered by the government at the trial of the criminal case covered only a nine-month period from September 1962 through July 1963. Defendants' published prices for high volume popular fixtures showed increases that varied from $3.07 to $4.57. Thus, the recovery per unit was from two to three times the actual price increase.

The total amount of the fund in the contractor settlement was some $2,400,000, while in the wholesale settlement the fund amounted to some $1,100,000. There were of course many more litigants and claimants involved in the builder-owner settlement, but even so, the $29,300,000 fund created by petitioners' efforts averaged out to a much larger per unit figure than in the other two settlements.

One of the reasons that the settlement fund now amounts to over $29,000,000 is that petitioners insisted that defendants agree to pay interest on the amounts to be contributed. Because of notice requirements and the size and complexity of the litigation, it appeared that several years might pass before the various settlements could be finally approved by the Court and the final judgments entered. The full-line settlement agreement required the payment of interest from April 1, 1970 and the short-line agreement from September 1, 1970. The final judgment approving those settlements was not entered until May 17, 1972. A similar provision as to interest was included in the Celotex settlement agreement.[21] All claimants have benefitted substantially from petitioners' foresight in insisting upon these provisions which at the time were novel in class action settlements of this kind.

That the original settlement was a most favorable one is indicated by the fact that only one attorney opposed it when it was presented to the Court on April 7, 1972 for final approval. In approving the settlement following that hearing, this Court made the following observation:

> "It is certainly unusual in a settlement of this size, with as many attorneys as we have had involved in it, and as many claimants, that there has been only one objection noted here today."

The objectors' witness, Mr. Connolly, testified that this was a "good" settlement and that his clients were very happy about it.[22] He further testified to the extraordinary accuracy of Mr.

---

21. Over $3,100,000 of pre-judgment interest has been added to the fund since the settlements were agreed upon.

22. Later in his testimony, Mr. Connolly agreed with the characterization suggested by objectors' counsel that the settlement was "acceptable but not exceptional." From a reading of his deposition in its entirety, this Court will give full credit to that portion of Mr. Connolly's testimony in which he described the settlement as a "good" one.

Kohn's preliminary estimate that the proposed settlement would amount to approximately $10 per bathroom unit.

The objectors, in claiming that the settlement achieved in this case was an unremarkable one, rely on certain statements made during earlier proceedings in this case by Mr. Samuel Seymour, an attorney in Mr. Connolly's office. But Mr. Seymour did not testify at the evidentiary hearing that was held following remand, nor was he deposed before the hearing. Mr. Connolly had no personal knowledge of the basis for these statements, and no weight can be given to what Mr. Seymour said as an advocate while representing clients in earlier proceedings in this case.

From the evidence presented, this Court concludes that petitioners, in the face of determined opposition by experienced adversaries representing the defendants, were able to achieve a result very favorable to the entire class.

## IV

## THE AWARD

Petitioners contend that this Court should make an award to them in the amount of 20% of the portion of the fund distributable to the unrepresented claimants, or some $1,629,000. The objectors assert that the total award should be $299,900 and that the unrepresented claimants should be required to pay only their proportionate share, or some $78,000.[23]

This Court interprets the Third Circuit's opinion in *Lindy Bros.* as prohibiting a percentage award in a case of this sort.[24] The standards and procedures which now govern in this Circuit[25] require an initial determination based solely on the time spent and a final determination reflecting "at least" the two additional factors previously discussed. 487 F.2d at 168. The latter two factors give the trial court the needed flexibility to tailor an award to the actual performance of counsel. *Merola v. Atlantic Richfield Co.*, 493 F.2d 292, 298 (3d Cir. 1974).

In concluding that the contingency factor and the quality factor require an increase in the amount of the initial determination here, this Court finds that such increase should not automatically be applied to every type of services rendered. Compensation for services performed by petitioners in connection with the preparation and presentation of their fee petitions in this Court and on appeal will be adequate at the hourly rate previously determined to be reasonable. Time spent by paraprofessionals and law students will be similarly treated,[26] as will the time spent since March 20, 1974, all of which related to fee matters. Finally, this Court concludes that compensation for future time, based on the estimate that this Court has found to be reasonable, should not be increased because of the aforementioned additional factors.

---

23. *Petitioners question the motives of the objectors in opposing all but minimal fees for them as attorneys for the class representatives. Friendswood and Humble are subsidiaries of Exxon Corporation, which is frequently a defendant in class action litigation. Counsel for the objectors has written an article characterizing the class action device as "an engine of destruction". Class Actions—Useful Tool or Engine of Destruction, 55 F.R.D. 375 (1972). Petitioners suggest that the objectors here seek to limit class fees so as to discourage the prosecution of class actions by the ablest and most experienced plaintiffs' attorneys.*

24. *Of course, after the amount of a fee has been determined, a court may wish to test*

its reasonableness by computing the percentage of the entire fund awarded as a fee and comparing the resulting figure with those in similar cases.

25. The *Lindy Bros.* opinion has become a leading case on the subject of class action fees and has within a very short period of time been followed in other jurisdictions. *City of Detroit v. Grinnell Corp., supra; Liebman v. J. W. Peterson Coal & Oil Co.*, 63 F.Supp. 684 (N.D.Ill.1974).

26. Petitioners are entitled to be reimbursed for the cost of their paraprofessional help but no more. *City of Detroit v. Grinnell Corp., supra*, 495 F.2d at 473.

With the exception of these items, this Court finds and concludes that all the other amounts determined on the basis of a reasonable hourly rate should be doubled because of the contingency and quality factors discussed hereinabove. A breakdown of the final award is therefore as follows:

| Categories Increased | Total |
| --- | --- |
| Pleadings | $ 14,410.00 |
| Discovery | 271,049.00 |
| Court Appearances | 120,880.00 |
| Settlement | 107,115.00 |
| Interventions | 26,170.00 |
| Settlement Administration | 122,437.50 |
| Briefs and Legal Research | 82,699.00 |
| General Matters | 301,170.70 |
| Other Appellate Proceedings | 3,500.00 |
| Sub-Total | $1,049,431.20 |

| Categories Not Increased | |
| --- | --- |
| Fee Application and Appeal | $ 29,806.25 |
| Paraprofessional and Law Students | 4,874.00 |
| Time Spent Since March 20, 1974 | 40,654.00 |
| Future Time | 10,000.00 |
| Sub-Total | $ 85,334.25 |
| Total Award | $1,134,765.45 |

Under such an award, petitioners Kohn and Berger will be compensated for much of their time at a rate of $250 per hour, for much of Mr. Fine's time at $200 per hour and for much of the time of other attorneys in their firms at $70–$140 per hour.

Such hourly rates are reasonable under all the circumstances of this case and are even less than those rates applied in other class action litigation. In Arenson v. Board of Trade of City of Chicago, 372 F.Supp. 1349, 1359 (N.D. Ill.1974), Judge Bauer recently awarded fees in an antitrust case to various attorneys following settlement of a class action, including awards to Mr. Fine at $400 per hour and to Mr. Kohn at $500 per hour. In multidistrict litigation involving the gasoline industry, fees of over $500 per hour for the time of all counsel were recently awarded by Judge Augelli. See Order in City of Philadelphia v. American Oil Company, 53 F.R. D. 45 (D.N.J.1971). In City of Philadelphia v. Chas. Pfizer & Co., 345 F. Supp. 454, 485 (S.D.N.Y.1972), Judge Wyatt, although criticizing what he deemed to be unnecessary interventions in that case, still awarded petitioners Kohn and Berger fees which amounted to $200 per hour for the time spent by every attorney in the two firms who worked on the case, without regard to his or her status as a senior partner, junior partner or associate. In Donson Stores, Inc. v. American Bakeries Co., 60 F.R.D. 417, 420 (S.D.N.Y.1973), the Court awarded fees that averaged $200 an hour for all attorneys in a "relatively uncomplicated case which was pioneered by the Government * * *"

It should also be noted that the total award in this case represents only some 3.9% of the total fund of $29,300,000. Such a percentage is substantially less than amounts awarded in similar cases. In Goldstein v. Alodex, *supra,* Judge Broderick listed fee awards in twelve recent cases. The percentages ranged from 19% to 30% of the recoveries, except for the award in In Re Four Seasons Securities Laws Litigation, *supra.* In that case, Judge Thomsen made awards aggregating only some 10% of the amount recovered, finding that the result achieved was "modest" and that some of the services rendered had not been of benefit to the classes. 59 F.R.D. at 665–666.

Of course, petitioners will in addition receive from their own clients some $861,000 in fees. But even if they received all of those amounts as well as the entire award made herein, the aggregate fees paid to them would still be less than 7% of the total recovery in this case.

## V

### ALLOCATION

Having determined the total reasonable value of petitioners' services to the entire class, this Court must next decide what portion of the amount arrived at should be paid by the unrepresented claimants. Ordinarily and absent extraordinary circumstances, the unrepresented claimants should pay a percentage of the reasonable value of attorneys' services to the class equal to the percentage of the class' recovery. 487 F.2d at 169.

For purposes of making such determination in this case, the entire settlement fund must be divided into three separate categories.[27] The corrected total number of units in the settlement (excluding claims against Celotex only) is now 2,704,329. The three categories of the settlement fund are as follows:

1. The claims of those litigants represented by petitioners Kohn and Berger, totaling 497,254.4 units, or 18.4% of the total fund;

2. The claims of those litigants represented by counsel other than petitioners Kohn and Berger, totaling 1,455,916.2 units, or 53.8% of the total fund; and

3. The claims of the unrepresented claimants, including those of the objectors, totaling 751,158.4 units, or 27.8% of the total fund.

Therefore, the distributions of the fund will be approximately $5,391,200 to claimants in Category 1; $15,763,400 to claimants in Category 2; and $8,145,400 to claimants in Category 3.

This Court has found that petitioners are entitled to an award of $1,134,765.-45, representing reasonable compensation for the creation of a settlement fund to be distributed among all claimants. Relying on the Third Circuit's opinion in remanding this case, the objectors contend that the portion of the fee to be paid by them should be 27.8% of the total award, a sum which would amount to $315,464.80 under the determinations which this Court has made herein.[28]

Obvious and glaring inequities result from such an approach. If the unrepresented claimants were required to pay only 27.8% of the fee awarded herein, the amount to be deducted from each unrepresented claimant's recovery as attorneys' fees would be less than 4% of the sum distributed. The litigants represented by petitioners and by other counsel would thus be paying over eight times as much in attorneys' fees, and even more if any portion of this award were allocated against them. The litigants represented by petitioners have agreed to pay contingent fees amounting to $33\frac{1}{3}\%$ of the amount recovered. Similarly, the other litigants have entered into agreements with their attorneys providing for the payment of contingent fees in amounts ranging from 20% to 40%.[29]

Furthermore, if the unrepresented claimants pay only 27.8% of the award, who will be responsible for payment of the balance of the fee that petitioners have earned for their productive efforts in this case? In their original application, petitioners quite properly recognized that no additional fees should be charged against their clients, who will be paying petitioners $861,191 under the contingent fee agreements in effect. Moreover, this Court has previously

27. In their original application, petitioners divided the fund into four separate categories. However, in its earlier opinion in this case, this Court found that suggested categories 2 and 3 should be treated alike. See 341 F.Supp. at 1085–1086. Thus, the portion of the fund to be distributed to claimants represented by attorneys other than petitioners will now be treated as one category, not as two.

28. In their briefs and arguments, the objectors have used the figure of 26%. However, the detailed figures that have now been supplied indicate that this percentage should properly be 27.8%.

29. The problem of equalizing fees among all claimants was previously discussed by this Court in its earlier opinion. 341 F.Supp. at 1091–1092.

ruled that none of the other litigants should be required to pay any additional fees beyond what they have agreed to pay their own attorneys in this litigation. No appeal was taken from that ruling which has now become final. Thus, this Court could hardly now allocate a percentage of the total fee against the litigants in Category 2 who have not been given an opportunity to be heard in connection with the suggestion that they now be charged with a proportionate part of this award. And if no part of the award is allocated against litigants in Categories 1 and 2 and only 27.8% of the award is allocated against the unrepresented claimants in Category 3, then petitioners will not be receiving substantial portions of the fee which this Court has found to have been earned.

 ██ It would indeed be an unfair result if this Court in the exercise of its equitable powers were to administer this fund in such a way that those who assumed the risk and expense of this litigation at the outset were now required to pay attorneys' fees at least eight times as large as those unrepresented claimants who played no part in the creation of the fund and who did no more than file a claim herein in order to become entitled to payment. If fees are allocated in the manner suggested by the objectors, those who expended the least effort would benefit the most. See 341 F.Supp. at 1086. Prospective litigants, like attorneys, must have some incentive for furthering the public interest by pursuing antitrust actions as private attorneys general. See Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc., 481 F.2d 1045, 1050 (2d Cir. 1973). If court rulings make it apparent that active litigants must expect to pay as fees substantially more of a percentage of their recoveries than nonlitigating claimants, potential plaintiffs will be discouraged from assuming the risks and burdens of

such class action litigation and will sit on the sidelines waiting for someone else to file suit.

The unfairness of such a result was recognized by the objectors' own witness, Mr. Connolly, who testified as follows:

"Probably the greatest inequity is —and I think one that has to be looked at by the courts in the future is—that probably those that did not hire their own lawyer and just came in to participate in the class action at the end probably profited better than those that bore the heat of battle. I think that's a big problem for courts in continuing class action suits." [30]

In considering whether attorneys' fees are recoverable in a Miller Act case, the Supreme Court recently observed that the federal judiciary has recognized several exceptions to the general principle that each party should bear the costs of its own legal representation. F. D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 94 S. Ct. 2157, 40 L.Ed.2d 703 (1974). At page 129 of its opinion, 94 S.Ct. at page 2165, the Court said this:

"[W]e have long recognized that attorneys' fees may be awarded to a successful party * * * where a successful litigant has conferred a substantial benefit on a class of persons and the court's shifting of fees operates to spread the cost proportionately among the members of the benefitted class. The lower courts have also applied a rationale for fee shifting based on the premise that the expense of litigation may often be a formidable if not insurmountable obstacle to the private litigation necessary to enforce important public policies." (Footnotes omitted.)

In this Court's opinion, the inequities discussed herein amount to extraordinary circumstances under the present posture of the case. Thus, this is not a

---

30. Mr. Connolly went so far as to suggest that the unrepresented claimants, those "who came in after the job was done", should bear more of the expense of the litigation than those who had been named the plaintiffs.

case in which the unrepresented claimants should pay a percentage of the total award equal to their percentage of the total recovery. Instead, this Court will undertake in the exercise of its equitable powers to shift the fees so as to spread the total cost more fairly among the members of the benefitted class.

■ A fair and reasonable approach to the problems of allocation in this case would first suggest that the unrepresented claimants should not have to pay that part of the award (18.4%) that is attributable, on a proportionate basis, to the recoveries by those litigants represented by petitioners. Under their contigent fee agreements, petitioners will be receiving fees amounting to some $861,000 from these litigating claimants. Even though such agreements were privately negotiated and had no reference to any other factor besides the amount of the recovery, the fees paid thereunder, and nothing more, may be deemed reasonable compensation for the time and effort expended by petitioners in producing the $5,391,200 to be distributed to their clients under Category 1. The unrepresented claimants should not have to pay for that portion of the total benefit which was conferred on petitioner's own clients and for which petitioners will be adequately compensated under their private agreements.

However, this Court concludes that equitable considerations do require that all of the remainder of the award (or 81.-6% of the amount found to be reasonable compensation) should be paid by the unrepresented claimants. The objectors concede that 27.8% of the fee awarded should be paid by the unrepresented claimants. They vigorously oppose payment of any part of the remainder which they argue is not properly allocable to them.[31]

In its earlier opinion, this Court found that the efforts of attorneys representing litigants in category 2 did in fact contribute to the creation of the settlement fund. On the record here, this Court would reaffirm its previous finding that "no settlement would have been possible without the cooperation and efforts of numerous attorneys for plaintiffs who likewise filed suit." 341 F.Supp. at 1086. Thus, these other attorneys conferred a benefit on the unrepresented claimants for which they would ordinarily be entitled to receive compensation. When these matters were previously before the Court, no shifting of fees was necessary between Categories 2 and 3 (as now constituted), in view of the Court's approach to the problem of allocation.[32] See 341 F.Supp. at 1091–1092. Under this Court's previous ruling, litigants in Category 1 would have been paying some 33⅓% of their recoveries as attorneys' fees, litigants in Category 2, 20% to 40%, and claimants in Category 3, 20%. Although noting the different results achieved, this Court found that no substantial inequity resulted since complete equalization among all claimants was not possible in any event. 341 F.Supp. at 1092. No part of the total award sought by petitioners was previously allocated against the litigants in Category 2 for two reasons, first because this Court had concluded that an adequate award for petitioners (in addition to what they would receive from their own clients) would be 20% of the amount distributable to the unrepresented claimants; and secondly because the litigants in Category 2 would be paying a disproportionately large percentage of their recoveries if required to pay any part of petitioners' fees.

In the present posture of the case, petitioners would not be adequately compensated if they were denied recovery of 53.8% of the award here. On the other hand, if this portion of the award were

---

31. The amount in dispute is 53.8% of the award made herein, or some $610,503.81.

32. As noted hereinabove, there were four categories of claimants discussed in the earlier opinion, but these have now been reduced to three.

allocated against the litigants in Category 2, they would be paying fees totaling some 24% to 44% of their recoveries while the unrepresented claimants would be paying as fees only some 4% of their recoveries.

This Court concludes that the value of the benefits conferred on the unrepresented claimants by the many attorneys who represented litigants in Category 2 and who contributed to the creation of the settlement fund is at least $610,503.81. The value of the benefits conferred by petitioners on the litigants in Category 2 has been found to be that amount. An equitable set-off should thus be made. In lieu of being required to pay substantial fees to attorneys representing litigants in Category 2, the unrepresented claimants should be required to pay to petitioners that portion of the award which would normally be allocated against those litigants. In other words, petitioners are entitled to recover $610,502.81 from the Category 2 litigants, and the latter are entitled to recover at least this same amount from the unrepresented claimants for the benefits that the attorneys for such litigants conferred on such claimants in the creation of the fund.[33] Thus, it is equitable to charge the unrepresented claimants for the full amount that would otherwise be allocated against the Category 2 litigants.

Under such an allocation, the total fees to be paid by the unrepresented claimants amount to $925,968.61.[34] Such sum is less than 12% of the $8,145,400 to be distributed to them. This group of claimants can hardly claim that this allocation is unfair when all other claimants in this litigation are paying from 20% to 40% of their recoveries as attorneys' fees.

## VI

## CONCLUSION

For the reasons stated, this Court finds and concludes that attorneys' fees in the amount of $925,968.61 should be paid to petitioners from the portion of the settlement fund distributable to the unrepresented claimants. This Court's findings of fact and conclusions of law are embodied in the foregoing opinion, whether or not expressly so characterized. Petitioners are directed to submit an appropriate Order.

33. In its opinion in *Lindy Bros.*, the Third Circuit called attention to the problem arising in a case such as this one where there are overlapping claims by attorney and client. 487 F.2d at 166. However, the Court did not intimate any view concerning the ability of litigants to require application against attorneys' charges to them of all or part of the fees paid by the unrepresented claimants.

34. Including amounts received from their private clients, the total fees that petitioners will recover in this litigation amount to some $1,787,000.